129 F.3d 1268
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
TAURUS HOLDING COMPANY OF AMERICA, INCORPORATED, and Leoco,
Plaintiffs-Appellants,
v.
Reginald THOMPSON, Julia Thompson, T.L.C. Gem Labs,
Incorporated, et al., Defendants-Appellees,
 No. 97-1590.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 29, 1997.
Decided Nov. 17, 1997.
 
 1
 Before Hon. Joel M. Flaum, Circuit Judge Hon. Kenneth F. Ripple, Circuit Judge Hon. Terence T. Evans, Circuit Judge
 
 ORDER
 
 2
 The Taurus Holding Company of America (and LEOCO, its co-venturer) sued Reginald Thompson (along with his wife and companies) for breach of contract and fraud, alleging that Thompson bilked them out of thousands of dollars with false representations of how much they would make in the gemstone market. Their investment of approximately $300,000 in uncut rubies, they say, should have pulled in about $9 million. Instead, they lost their shirts. Their claims against Thompson came up dry after a trial, and Taurus appeals.
 
 
 3
 In an odd twist, Taurus, the appellant, claims that we lack jurisdiction because the district judge, Larry J. McKinney, did not explicitly decide several contract and fraud issues and a motion for sanctions. While it's true that our jurisdiction is limited to final judgments, the finality rule does not compel a district judge to elaborate on each and every issue. If the district judge's ultimate order is inconsistent with the continuing viability of any claims, it is final and appealable. See Ford Motor Co. v. Transport Indemnity Co., 795 F.2d 538, 543 (6th Cir.1986). That's the case here, as Judge McKinney necessarily decided all contract and fraud issues by rejecting Taurus' claims in their entirety, and he undercut the motion for sanctions when he refused to strike the counterclaim that Taurus thought was sanctionable.
 
 
 4
 Next, Taurus argues that the district court should have granted summary judgment to it because Thompson didn't respond to Taurus' requests for admissions within 30 days. We disagree. The district judge had discretion under Rule 36(a) of the Federal Rules of Civil Procedure to toll the due date for the response where, as here, Taurus included requests for admissions in its complaint and Thompson filed a timely motion to dismiss the pleading. Taurus also argues that because Thompson's attorney was not formally admitted pro hac vice until after he filed his response, the motion to dismiss was a nullity and could not have a tolling effect. This argument is also a loser because a district judge has discretion over pro hac vice admission and its consequences. And here, one could hardly find anything close to an abuse of discretion by the district judge.
 
 
 5
 As to the trial, Taurus argues that Judge McKinney's decision was clearly erroneous and that a new trial should be ordered. The district judge conducted a 2-day trial, reviewed the facts, and wrote a comprehensive 79-page opinion. On appeal, Taurus presents nothing more than a rehash of factual claims advanced and rejected at the trial. Having reviewed the record, we conclude that no clear errors have been identified, and we see no reason why we should set aside the district court's judgment. Instead of retrying this case on appeal, we choose to adopt Judge McKinney's order (which is attached) as our own.
 
 
 6
 Accordingly, the district court's judgment is
 
 
 7
 AFFIRMED.
 
 ORDER
 
 8
 This matter was tried to the Court on July 29 and 30, 1996, at the end of which the Court took the case under advisement. Only Reginald Thompson and TLC Gem Labs, Inc. (collectively "Thompson") remain as defendants against the charges brought by the plaintiffs, Taurus Holding Company of America, Inc. and LEOCO (collectively "Taurus").[1] Taurus presented claims for breach of contract, fraud, a civil RICO violation, and sought imposition of a constructive trust based on unjust enrichment, and another constructive trust based on Reginald Thompson's failure to obtain insurance and a bond. The last claim is more appropriately considered part of the breach of contract claim.
 
 
 9
 The Thompson defendants filed a counterclaim for damages based on several alleged oral agreements between themselves and Taurus Holding Company. Those agreements relate to the grading of more than 37,000 carats of ruby cabochons by Thompson, reimbursement for his purchase of a powder scale and of his travel expenses for two trips to New York. Defendant Reginald Thompson ("Reg") also makes a claim for several ruby cabochons he allegedly delivered to Taurus, and for which he presumably was not paid. Finally, the Reg claims damages pursuant to a "memorandum of understanding," equal to fifty percent of an earnest money deposit from a potential buyer who did not conclude the transaction.
 
 
 10
 The Court has heard the evidence, considered the materials entered as exhibits, reviewed the parties' post-trial briefs,[2] and is now ready to make its decision. For all the reasons provided below, the Court finds that the claims against Thompson for breach of contract, fraud, constructive fraud and civil RICO violations have failed. Likewise, the claims seeking to impose a constructive trust must fail. Judgment will be entered accordingly against the plaintiffs. The Thompson defendants' counter-claim for recovery of the costs of grading approximately 37,000 carats of ruby cabochons is GRANTED in part, DENIED in part.
 
 
 11
 Thompson, however, retains approximately 25,600 carats of ruby cabochons that belong to Taurus, and for which defendant T.L.C. has been awarded its grading fees. The Court orders that, upon receipt of the outstanding grading fees, Thompson return these stones to Taurus. Likewise, Taurus is in possession of three ruby cabochons that belong to Thompson. Taurus is ordered to either return those cabochons to Thompson immediately, or pay him an amount equal to the lower of his cost or the current market value of the stones.
 
 I. ISSUES
 
 12
 The issues raised by the parties at trial may be placed into four categories: first, issues dealing with guarantees or representations, second, those relating to use of the proprietary process, third, issues about sales and marketing efforts, and fourth, disputes about the existence and performance of conditions precedent. The first category relates primarily to the claims of fraud and RICO violations. Among those issues is a dispute about the circumstances surrounding the use of Thompson's appraisal of the gemstones shown to Taurus' president, Peg Goldberg ("Goldberg"), in Chicago in June 1993.
 
 
 13
 Those stones belonged to Tarik Wansa ("Wansa") and Thompson was the gemologist who had appraised them more than one year earlier for Wansa. Thompson claims that his appraisal, based on viewing a representative sample of the stones, was conditioned on seeing the rest of the stones that belonged to Wansa.[3] He also claims he did not give a copy of that appraisal to anyone from Taurus. Taurus argues that the appraisal was not conditional, and that Thompson specifically adopted the former appraisal in connection with the stones Goldberg viewed.
 
 
 14
 The parties also disagree about whether Thompson "guaranteed" a specific return on an investment in the Gemstones, based on obtaining a specified quantity of marketable stones from the rough material, and on a wholesale market price of a "minimum of $25.00" per carat. Thompson claims he made no such guarantees, rather he speculated, estimated, and anticipated those returns based on the conditions of the market at the time, and on the use of his cutting methods. Taurus argues that Thompson made numerous oral representations about the expected return on their investment and about how easy the stones would be to sell. In fact, according to Taurus, Thompson "promised" such a yield, and Taurus reasonably relied on his expertise as a gemologist when it acted on that promise. In contrast, Thompson claims that he repeatedly told Taurus and its agents that the market was untested, which made it harder to predict with certainty any given return on their investment.
 
 
 15
 With respect to the second category, use of the proprietary process, the issue is whether the contracts required Thompson to apply the proprietary process to the first forty pounds of gemstones purchased from Reg. A related issue is whether Thompson had to apply that process to any of the Gemstones. According to Thompson, he made it very clear to Taurus that he would teach his process to the cutter initially, in anticipation of subsequent orders on which the process would be used. Taurus argued that the reason they entered the contract with Thompson at all was to obtain stones finished with his proprietary method. Although agreeing that Taurus would eventually enjoy the benefit of that process, Thompson stated that the cutter could not afford to overhaul his equipment to facilitate use of the process until he had a much larger order. Taurus was aware of that fact and knew that their first batch of stones would not have the proprietary finish on them, Thompson maintained.
 
 
 16
 The third category has to do with the sales and marketing efforts the contract required of Reg. According to Taurus, Reg was obligated under the contract to actively sell the gemstones until they were all sold. Reg, on the other hand, understood that he was only obligated to assist with marketing the stones, or otherwise to develop the market for them, and to use his best efforts to sell the stones for Taurus. Another marketing dispute centers around whether Taurus was obligated to buy and sell a larger quantity of stones belonging to Thompson's business partner, Bob Dainty ("Dainty"), before Thompson would be required to use the proprietary process on Taurus's stones. According to Taurus, they only agreed try to find a buyer for those stones, not to buy the stones themselves, or be obligated to sell them.
 
 
 17
 A side issue is whether the contract required Taurus to pay for all of Reg's travel expenses connected with the marketing of the stones. According to Reg, he was only required to pay his own expenses if there was a sale in which he participated and for which he would earn an eight percent commission. Taurus claimed that Reg was obligated to pay his own way even if a sale did not occur from the travel.
 
 
 18
 Finally, category four involves the conditions precedent to each party's required performance, or other obligations imposed by the contracts. Thompson claimed that Taurus was contractually required to pay him the cost of grading all of the finished Gemstones they had purchased from Reg, before he had to release those finished and graded stones to them. He relies on an alleged oral agreement related to this issue, but the Court notes a provision in the contract between T.L.C. Gem Labs, Inc. and Taurus, in which the "subject matter" is the "finishing and grading of all the rubies" to be performed by T.L.C., or a cutter they supervise. Since Reg is the president of T.L.C., and he is the one who did the grading, he may base a claim for grading fees on that written contract provision. Taurus does not dispute the amount of fees being charged, but argues that they should not have to pay for grading stones that will not sell.
 
 
 19
 Taurus argues that it performed all conditions precedent to Thompson's obligations and that Thompson failed to meet those obligations. Naturally, Thompson disagrees. With respect to the required insurance policy, he claims that it was impossible for him to obtain it, because Taurus could not afford to pay the premium. Likewise, in connection with becoming bonded, Thompson claims that no bonding companies were selected, and Taurus, who was obligated to pay for the bond and had to approve the amount and the company, should have done the selecting. Moreover, Thompson states that he made it clear from the beginning that he would not reveal his financial information to anyone. To the extent that such a refusal would have prevented acquiring a bond, Taurus knew about this before it entered the contract. Taurus accuses Thompson of willfully refusing to cooperate in the acquisition of both a bond and key man insurance.
 
 II. FACTUAL BACKGROUND AND FINDINGS
 
 20
 Between November 19, 1993, and January 5, 1994, Taurus and Thompson entered into a contractual relationship governed by two separate written agreements. Plfs' Exh. 13 and 14. One contract was between Taurus and Reginald Thompson personally (the "Thompson Contract"), and the other was between Taurus and Reg's company, T.L.C. Gem Labs, Inc. (the "T.L.C. Contract"), but signed by Reg as president of T.L.C. What is obvious about these contracts is that the goal was to keep certain mine run rubies (the "Gemstones") moving through the economy, not unlike the famed "hot potato" of the children's game. Reg owned approximately 320 pounds of Gemstones, Taurus owned approximately forty (subsequently ninety-two) pounds of similar stones, and they both were anxious to sell what they had. Likewise, both parties wanted to be part of a deal wherein more than 4,000 pounds of Gemstones owned by Dainty (the "Dainty Stones") would be sold, but neither of them wanted to be stuck holding those stones. Consequently, they structured their contracts accordingly.
 
 
 21
 Reg wanted to sell his 320 pounds of Gemstones while the market was favorable. Taurus was interested in buying them from him only because they would gain experience selling Gemstones in anticipation of marketing the Dainty Stones. Although Taurus was particularly anxious to participate in a deal to move the Dainty Stones, they were unwilling to become the sole owner of such a large quantity. In other words, they wanted the right (without the obligation) to purchase Dainty's Stones. Taurus also wanted to prevent anyone else from acquiring the stones from Dainty while they tried to find a third party to whom they could sell them. Once a buyer was found, Taurus planned to quickly buy the Dainty Stones themselves and turn around and sell them to that buyer. The timing of the deal was crucial.
 
 
 22
 A couple of problems plagued this plan. First, in order to get the Dainty Stones they would have to deal with Reg, who had a Power of Attorney from Dainty for purposes of selling the stones. (Notice that Reg did not own the Dainty Stones, he just had the right to sell them, presumably for a fee). In addition to selling the Dainty Stones to Taurus, however, Reg wanted to sell his Gemstones to them,'which were from the same batch of Gemstones as Dainty's. Ostensibly, the sale of Reg's stones would introduce Taurus to the market for stones like Dainty's, develop a track record for the stones, and allow Taurus to acquire capital for the purchase of the Dainty Stones. Reg's testimony was that his primary objective was to sell the Dainty Stones. He also wanted both Taurus and the ultimate buyer of the Dainty Stones to use his proprietary process and his services for the cutting, grading and polishing of the stones.
 
 
 23
 The other problem was that Taurus did not have the cash up front to either acquire the right to buy the Dainty Stones, or to buy all of Reg's stones at once. That is what led them to LEOCO, who invested $254,000.00 in the deal as a joint venturer. Jim Stancil ("Stancil") was the link between Taurus and LEOCO, a partnership composed of four business executives.[4] The LEOCO executives were looking for a way to get richer quicker, and Stancil sold them on Reg's qualifications and on Taurus's and Reg's stones, enticing them with the prospect of making millions from the Gemstone market.
 
 
 24
 To get LEOCO into the deal, however, Stancil and Taurus had to make it very attractive, which they did by emphasizing Reg's credentials and repeating his estimates and projections as facts. Perhaps a little exaggeration was included. It was crucial that LEOCO be convinced that the deal was sound, even if almost too good to be true. This explains why Goldberg, the president of Taurus, was willing to buy a sealed bag of Wansa's stones in Chicago sight unseen, merely on the basis of Reg's representation that those stones felt "consistent with the original lot of material previously appraised by myself for Mr. Tank Wansa." Plfs' Exh. 9. All that was needed was Reg's authentication of the stones' value and Taurus could keep them moving through the economy.[5]
 
 
 25
 To succeed in this venture, however, Taurus needed Reg's full cooperation, especially if LEOCO ever got suspicious of the deal. And of course LEOCO did get suspicious when, four months after they invested more than a quarter of a million dollars in the deal, no stones had been sold. Such sales would have provided both Taurus and LEOCO with the money necessary to proceed with buying the rest of Reg's stones and the Dainty Stones. Reg stated he was trying to sell the Gemstones to all his contacts, including those he made at the annual gemstone show in Tucson, Arizona in February, 1994. He attributed his lack of success to the time of year and the upcoming gemstone show. While at the Tucson show, Reg heard rumors that a large amount of Burmese star rubies were going to be dumped on the market all at once, which he feared would lower the market price. According to Reg, he did not share that information with Taurus right away because it was unsubstantiated rumor, and he wanted to verify it first.
 
 
 26
 Taurus considered this conduct to be a breach of contract in that Reg purposefully withheld crucial market information, although they do not cite any contract provision that would require Reg to reveal to them all the market information he possessed. The parties do not agree about when Reg finally disclosed this information to Taurus. Reg said he told them after he was able to confirm the rumors, which took a couple of weeks, and after he tested the effect on the market by determining that no potential buyers were interested in Taurus's stones, which took several more.
 
 
 27
 According to Goldberg, the first Taurus heard about the flood of Burmese rubies on the market was two and one-half months after the show, in a letter dated April 26, 1994. In that letter, Reg said he had lied to everyone, in retaliation for the many lies they had told him. Plfs' Exh. 26. At trial Reg stated that when he said he had lied, he was referring to his nondisclosure about the Burmese stones. Thompson Tr. Test, Cross-exam. In the April 26, 1994, letter he referred to the flood of Burmese rubies and wrote:
 
 
 28
 I discovered this while I was in Tucson, and confirmed it with numerous phone conversations around the world shortly after I got back from Tucson. I didn't tell you of my findings, as I still felt sure that we could find someone who would buy your material.
 
 
 29
 Id. In light of this evidence, the Court finds that Reg did not inform Taurus about the Burmese rubies until the April 26, 1994, letter, some two and one-half months after the show.
 
 
 30
 Even before the April 26 letter, however, correspondence between the parties revealed the beginnings of a strained relationship. A letter dated January 20, 1994, began with "Got your phone message, and before we all fly off the handle completely, let me explain the situation, as it happened." Def's Exh. H. The tussle seems to have been about the payment by Taurus of a $50,000.00 nonrefundable deposit to Reg before he and Dainty would fly to New York to show the Dainty Stones to a prospective buyer. The letter included a subtle warning to Taurus about the consequences of delay. Reg informed them that he received a fax from the "lawyers of Bob's [Dainty] potential buyer. They have instructed me to fly to New York on Monday, January 31st, to meet with them and sign the final papers on Tuesday." Def's Exh. H. He also mentioned that Dainty's buyers would wire a deposit to Reg before Friday of the next week, and that they had already viewed the material.[6] Reg concluded with a statement that he would prefer to do business with Taurus, because he stands "to make more money on the cutting and selling of the cabochons. However, first come, first served. I have no choice." Id.
 
 
 31
 On January 24, 1994, Reg wrote to Taurus that Dainty was not happy about the delays in receiving signed contracts and "placement of monies" for the sale to Taurus of the Dainty Stones. Def's Exh. J. Although by this time Taurus had already transferred about $110,000.00 to Thompson, Reg indicated they must send more. Purportedly, the money was to hold the Dainty Stones so that they were not sold to someone else while Taurus was trying to put a deal together so they could buy them.
 
 
 32
 Specifically, Reg said that unless Taurus wired $20,000.00 to his account by noon on January 26, 1994, Dainty would sign a contract with another buyer to sell his stones.[7] He also expressed confusion about why Taurus was unwilling to send the money to hold the deal when they knew they had a "sure deal" with either "Jim's clients" or "Tom and his group." Indicating some suspicion about the Taurus deals, Reg wrote, "Is there something that you aren't telling me? My neck is way out on the chopping block, based on the information you have told me." Id. He concluded with a promise that $20,000.00 wired to his account by noon on Tuesday (January 26) would hold the material through Friday, January 29.
 
 
 33
 To that letter Taurus must have responded with a proposed agreement for the sale of the Dainty Stones for Reg to review, along with the money. The $20,000.00 payment, however, went toward the purchase of twenty-one pounds of Reg's Gemstones, not to Dainty. Dainty and Reg required an additional $30,000.00 as an earnest money deposit to hold the Dainty Stones until February 18, 1994, or until completion of the sales transaction. Def's Exh. L, Letter Dated 1/25/94. Reg expressed some distress at the fact that Taurus continued to try to make the LEOCO group part of the contract for Dainty's Stones. See Def's Exh. K. LEOCO was unacceptable to Dainty because they required some "unknown" amount of profit before they would buy in large increments. Id. By January 26, 1994, Taurus had wired the $20,000.00 to Reg so he gave them until February 2, 1994, to wire the $30,000.00 deposit on the Dainty Stones. Twenty percent (20%) of that deposit Reg was to keep in accordance with an agreement he had with Dainty. Def's Exh. L.
 
 
 34
 Within days another wrinkle appeared. The problem was that the cutter in Thailand ("Boot") was reluctant to send the cut and finished stones to Thompson as they were completed, without first being paid in full for the entire job. Def's Exh. L, Letter dated January 28, 1994. Initially Taurus paid an amount equal to one-half the projected cutting fees, based on a forty percent yield of usable rubies from the Gemstones. Boot wanted them to send the other half of the fees before he would release the rest of the carats as they were finished. Reg also needed a sizable amount of stones to take with him to the Tucson gemstone show on February 3, 1994, so they would not look like a "nickel and dime" dealer.[8] He suggested that Taurus wire $48,442.00 to his account, and he would immediately send a check to Boot. On January 29, 1994, Goldberg wrote to clarify the yields Thompson was projecting, to which Thompson replied on January 30, 1994, that her "letter spelled out exact percentages and yields," while his letter referred to approximate figures. Def's Exh. L. He underlined "approximately" each time he used the word.
 
 
 35
 Reg sent another letter on February 1, 1994, stating he had a long talk with Dainty to try to convince him the sale would go through, but "It didn't work!!!". Basically, Reg emphasized the consequences to Taurus if the $30,000.00 deposit was not paid as instructed. He indicated that his health was beginning to suffer with the stress of the negotiations for a deal on the Dainty Stones.[9] To remove Dainty "from any further negotiations would be like taking a long needed vacation to some remote area of Hawaii. (I may do that anyhow.)" Id. What occurred instead was a wire transfer of $38,442.00 to Thompson on February 2, 1994, which was $10,000.00 less than the amount Boot needed in order to release the rest of Taurus's finished stones to Thompson as they were completed. However, according to Thompson's trial testimony, the remaining amount was received on February 8, 1994.
 
 
 36
 Apparently Taurus needed other written assurances from Reg about the purpose for the $30,000.00 before they could obtain additional funds from their investors. In a letter dated February 3, 1994, Reg confirmed that upon receipt of the deposit, two thousand pounds of "mine-run" rough ruby (corundum) crystals (Dainty's Stones) would be placed "on hold until the close of the business day of February 18, 1994." Def's Exh. M. On February 5, 1994, Taurus sent a copy of a proposed agreement to be used in connection with a potential sale of the two thousand pounds of Dainty Stones to a buyer they had found (the "main agreement"). Def's Exh. M. The main agreement involved payment by the buyer of twelve million, two hundred forty-six thousand, nine-hundred and eighty-four dollars ($12,246,984.00) for the stones. The price was computed at $2.50 per carat, plus an additional fifty cent per carat royalty for training of the buyer's cutting house by Thompson. Def's Exh. M.
 
 
 37
 Attached to the main agreement was one marked "Exhibit A," which was a proposed agreement between Thompson and the potential buyer, warranting that "the yield of all material purchased hereunder shall be no less than forty (40) percent of the total carats of the two thousand pounds." Thompson had signed the exhibit and written below his signature:
 
 
 38
 It is understood that above signatures are given based on the following:
 
 
 39
 1. one half (1/2) of all royalties referred to under [the main agreement] are due and payable to T.L.C. Gem Labs, Inc.
 
 
 40
 2. Payment shall be made in conjunction with travel expenses of $36,200, as referred to under [the main agreement].
 
 
 41
 3. Travel expenses and royalties shall be paid by wire transfer to Reginald Thompson's account prior to Thompson's departure to Thailand.
 
 
 42
 Def's Exh. M. The signed Exhibit A and a separate Warranty of Gemologist, were sent to Taurus with a letter dated February 8, 1994. Def's Ex. O.
 
 
 43
 In a note dated February 4, 1994, Reg reminded Taurus that "The $5 must be paid by Feb. 18th latest. No Trials! No Escrows! No Promises! In God we trust--all others pay cash. " Def's Exh. O. Five million dollars was the price Taurus was to pay for 4,416 pounds of material (Dainty's Stones), 2,000 pounds of which they planned to sell to their buyer for more than $12 million. See Def's Ex. L. Taurus had drafted the "Warranty of Gemologist" for Thompson to sign, and sent it to Thompson with the proposed Exhibit A to the main agreement for the sale of the Dainty Stones to the potential buyer. See Def's Exh. N, O.
 
 
 44
 The Gemologist Warranty, dated February 8, 1994 (the same day Thompson received the remaining $10,000.00 from Taurus), warranted to a potential buyer that the 2,000 carats of finished ruby gemstones (also called "cabochons") owned by Taurus and in Thompson's possession,
 
 
 45
 have been cut and polished using my proprietary process and, in my professional opinion, represent an average cross-section [sic] of the quality of star ruby and ruby cabochons which will be obtained from the 2,000 lbs. of material, which are the subject matter of the contract. In my professional opinion this material ranges in value from a low of $2.50/carat to a high of $750.00+/carat wholesale, for an average per carat price of at least $25.00/carat.
 
 
 46
 Plfs' Exh. 18; Def's Exh. N. At trial, Thompson admitted that the 2,000 carats of stones he held were not treated with his proprietary process.
 
 
 47
 Also during the trial, Goldberg admitted that she prepared this Warranty for purposes of sending it with the sample of stones from Thompson to a potential buyer in New York. She said Thompson signed the warranty and filled in the information in the blanks, such as the number of carats in his possession. Thompson did not present any evidence at trial to dispute that fact. Thus, the Court finds that Thompson signed a Warranty of Gemologist, dated February 8, 1994, for Taurus's use in attempting to sell 2,000 pounds of the Dainty Stones to a potential buyer in New York. He signed the warranty despite his knowledge that the 2,000 carats described therein had not been treated with his proprietary process as the warranty stated. He also signed a warranty without being able to control everything as he said he would require before he would make a guarantee of a specific return.
 
 
 48
 If Taurus had been successful in moving the 2,000 pounds of Dainty's Stones, Reg would have received approximately $455,000.00 in royalties, plus a $2,000.00 per diem for traveling to Thailand to oversee the cutting. Events may have turned out very differently had a sale occurred. But the sale did not materialize, apparently because the buyer felt the quality of the stones he was offered was not the same as the samples he had seen. Goldberg Tr. Test. Direct-exam.; Stancil Tr. Test. Direct-exam.
 
 
 49
 By February 14, 1994, Taurus found it advisable to fax Reg a "memorandum of understanding" reached in their February 12, 1994, telephone conversation. Def's Exh. P. In it they agreed that the projected date for closing the deal on the Dainty Stones with Taurus and the buyer in New York had been delayed due to bad weather, which prevented delivery of the sample stones to the buyer. According to Goldberg, the buyers had agreed to complete the transaction, to make a deposit of $500,000.00 in earnest money, and to set dates for the inspection of the material and for a closing. Id. All of this, however, was subject to their "receipt and approval of the 5 finished stones" Taurus had sent them, but the weather had delayed. Taurus admitted they could no longer meet the February 18, 1994, expiration date for their exclusivity rights on Dainty's Stones (which they apparently had obtained without depositing the $30,000.00). Id. Instead, they asked for an extension in exchange for transferring "an additional $30,000.00" to Reg's account on that day. See Def's Exh. Q. The deposit was made and Taurus received an extension of their exclusivity period until February 25, 1994.
 
 
 50
 Unfortunately, by February 17, 1994, Reg discovered that regulations for the vault where Dainty's Stones were kept would prevent him from entering it, unless Dainty accompanied him to New York before the close of business the next day, a Friday, to arrange for access. Def's Exh. R. Reg also discovered that he had to provide names and addresses of all the people who would be entering the vault with him, which information Taurus wanted to keep confidential. The logistics of the deal were further complicated by the fact that the following Monday was a legal holiday. The parties were running out of time before the February 26, 1994, deadline.
 
 
 51
 They must have succeeded in overcoming each of these obstacles, because the next piece of correspondence from Reg to Goldberg, dated February 26, 1994, acknowledged her phone call and stated that he was glad she, too, returned safely from New York.[10] The substance of the letter was directed at inquiring about what type of offer Goldberg had gotten from the potential buyer in New York. He noted that the exclusivity agreement had expired, and that Dainty had instructed him to call another buyer on Monday. Reg stated that he may be able to negotiate with Dainty on behalf of Taurus again if he knew the amount of money they would be able to offer for the stones. Def's Exh. R.
 
 
 52
 On March 1, 1994, Thompson prepared an analysis of the number of finished carats of Taurus's Gemstones in his possession that were in each of five quality classes. Plfs's Exh. 20; Def's Exh. S. In the report, Thompson admitted that he used the "S.W.A.G." (wild guess) method, because there was "no track record for this type of material in the marketplace." Id. However, Thompson stated that he believed the percentages were conservative, and that the $25.00 per carat average price was valid. In response to the concern expressed to him about the delay in receiving the rest of the Taurus material from Boot in Thailand, Thompson wrote again on March 8, 1994, to explain the delays. He said that the original time estimates had been given by Boot based on Thompson's assurances that the initial order for forty pounds would be followed by an order for 1,000 pounds. Upon receipt of such an order, Boot planned to expand his operation, add equipment and labor, and begin to cut the stones at a faster pace. According to Thompson, the "whole problem comes back to rest in our laps." Plfs' Exh. 21; Def's Exh. T. By implication, then, Thompson attributed the delays to the fact that Taurus had not sold any of Dainty's Stones.
 
 
 53
 Thompson assured Taurus that Boot was "finishing the original order now" as fast as he could, but that he is "doing it the old way, and that is not only very slow, but it also doesn't produce the finish that we want." Id. According to Thompson, he had purchased more than $7,000.00 worth of equipment for Boot in anticipation of the 1,000 pound order. That equipment could only be used in Thailand, unless it was converted for use on American electrical currents, which would cost approximately $2,000.00 more. If no large order were placed, he wrote, the equipment would go to waste. Presumably, when Taurus sold Dainty's Stones, they were to be sent to Boot for cutting.
 
 
 54
 Reg declared that he had done all he could to comply with Taurus's "wishes and demands," which had caused a strain on his relations with Boot and on his health. Id. He indicated that he may give the equipment to Boot as a goodwill gesture to make up for "this whole mess." He concluded with, "if your business falls by the wayside, as it looks like it will, I will have Boot cut my 300 pounds and I will enter into the Ruby market myself. The stage is set and the players are in place. We are just now waiting for the director to show up." Id.
 
 
 55
 Using a different strategy, Reg contacted Stancil in letters dated March 11 and 12, 1994, and sought an update on the negotiations between Taurus and the potential buyer. Def's Exh. T. Reg stated that if he did not get some information soon, he would have to spend his time on his existing business, rather than on Taurus. In the March 12th letter he indicated that Goldberg told him that Stancil would be sending him a list of concerns in connection with the ongoing negotiations. Id. He urged Stancil to fax the list to him over the weekend, because he was "really afraid that [Dainty] is most assuredly going to sell the material this next week. He has a buyer coming to see me on Wednesday." Id.
 
 
 56
 What happened next can only be described as a blitz of correspondence between Taurus, Reg and Stancil. On March 13, 1994, Goldberg wrote Thompson a letter to which she attached copies of two of Thompson's earlier communications about time schedules and yields. Def's Exh. U. These projections had been given by Goldberg, in connection with their joint venture to buy Reg's stones, to LEOCO, who was beginning to wonder if any of them were true. Of primary concern was when any sales would occur so the joint venture could receive a return on its investment, which by that time totalled more than a quarter of a million dollars. As Goldberg stated it, "our credibility is hanging out there." Id. Because several of the investors took out short-term notes to finance the deal, they were getting more nervous as the notes matured. She also reminded him that as soon as he sold some stones, her banker was prepared to personally invest in the deal.
 
 
 57
 In response to this fax, Thompson wrote, "I have very little to say." Id. He did state that his projections had preceded a change in his health that prevented him from traveling all over the country selling Gemstones. He indicated he was in the process of interviewing someone to do the legwork for him, and that he was "in contact with several potential 'buyers,' but handling it from my office is going to take time." Id. However, he noted that their contract, for a period of thirty-six months, did not contain any requirement about selling a set amount of stones in a shorter period of time. Thompson then dropped his first little bomb when he wrote,
 
 
 58
 As for taking my 'expectations' and making them a guarantee, you're way off base. Unless I have 100% control over a specific subject, I make no guarantees. I can only speculate. And ... that's what I did. If you think that I have 'wronged' you, then you have the choice of terminating our agreement.
 
 
 59
 Def's Exh. U.
 
 
 60
 In a March 13, 1994, letter, Stancil recited the concerns he had encountered while trying to sell the stones. He was getting calls daily from LEOCO about when the finished stones would be back from Thailand, and when they could expect a return on their investment. According to Stancil, LEOCO was anxious to assess Thompson's ability to meet his commitments, so they can decide whether to purchase the rest of the stones. "This program needs to get back on the schedule you committed to immediately. You are dealing with a group of professionals that have spent money based on your commitment and ability and they expect results in the form of revenues, not in the form of idle conversation." Id.
 
 
 61
 Stancil also sought information on behalf of two other groups with whom he was working to negotiate a deal: an equity group in Arkansas, and an organization that wanted to finance his purchase of the rough stones. Essentially, they sought assurances and guarantees about the quality of the material, that it would yield the amount of finished stones predicted, documentation in support of the minimum of $25.00/carat average wholesale price projection and that the product would be marketable. In addition, they asked about proof of the gemologist's qualifications, of the existence of the stones, that the rough stones would finish to the level of the sample ones, and that the stated schedules and timing would be followed. Id. Not only were the potential buyers asking for such proof, but they wanted the gemologist to furnish the proof in "legal and acceptable documents/warranties." Def's Exh. U.
 
 
 62
 In response to Stancil's letter, Thompson unloaded. He reiterated what he claimed to have said from the beginning, which was that, although a market exists for ruby cabochons, he did not know how much product that market can absorb before the wholesale price drops. He said he can only speculate as to the effect their rubies will have on the market, but he thinks there "is a good deal of money to be made." Plfs' Exh. 22; Def's Exh. V, Letter dated March 14, 1994. "I checked all my records and I only speculated. I never guaranteed anything, and if my speculations were transformed into guarantees, it was not of my doing." Id.
 
 
 63
 Reg asserted that he can guarantee his credentials, that the material is available, that title is clear and ownership can be transferred, that a forty percent yield would be realized if his method of cutting were used, that his proprietary polish is the finest on the market, and that $25.00 per carat is a conservative figure "based on present market figures for like material." Id. He could not guarantee the amount of time it would take to change rough into finished materials, the percent yield if his method were not used, how long it would take to sell the stones, any amount over the $25.00 per carat figure based on the present market, or that the "present market won't change overnight." Id.
 
 
 64
 After again denying that he made any guarantees about the stones, he stated, "Let's face it. There is not a single commodity you can invest in today and have an ironclad guarantee that you will make money doing it." Id. Reg reacted particularly strongly to Stancil's request for documentation about what type of compensation his buyers could expect if things did not go as promised. He wrote:
 
 
 65
 If your people are requiring that we have a lawyer draw-up documents that holds [sic] my feet to the fire should something not go as planned, then I would say that they are in the wrong game. The gemstone industry works on handshakes and "best effort" basis. Complicated paperwork is not accepted by anyone in the industry, including myself. I have, and will continue to give you the benefit of my years of experience in this business. I have the contacts. I have the knowledge. And, I have the material. What do you want to do?
 
 
 66
 Def's Exh. V.
 
 
 67
 Needless to say, from this point on the communications went downhill in tone. In a March 14, 1994, letter to Stancil, Reg indicated that he would help him with the "wordation" for a presentation he was going to make to the equity group. However, in response to Stancil's inquiry about a business plan, Reg said his "business plan" was to continue making contacts, waiting for a reply, sending samples out immediately if requested, and waiting for their decision. He stated that he can only "make the presentation," he can not make people buy. No specific timetable can be attached to this type of selling, according to Reg. Id.
 
 
 68
 In a secondary skirmish, Thompson and Goldberg were sparring over the acquisition of Key Man Life Insurance, which was a condition of both the Thompson and T.L.C. contracts. Plfs' Exh. 13, p 6; Exh. 14, p 4. Reg had cooperated in the process of acquiring an insurance policy by submitting for a physical exam, and completing an application by November 29, 1993. However, on March 8, 1994, he wrote to the local agent that he was withdrawing his signature from the application as of that date. Taurus had paid two months of premiums to bind the policy until its final approval, although their payment consisted of cash and Gemstones. In a letter to Reg on March 8, 1994, Taurus asked him to reinstate his authorization for the policy to avoid having to resubmit for another physical and additional delay. Reg refused, alleging he was acting under advice of counsel.
 
 
 69
 This dispute continued until April 13, 1994, when Reg wrote that he had checked with the state department of insurance and learned that Taurus's threat that the insurance company would "blackball" him cannot be fulfilled. Consequently, he was sticking to his earlier decision. In addition to fussing about the insurance policy in early April, Taurus also admonished Reg for not returning Stancil's phone calls. Def's Exh. X, Letter dated April 11, 1994. Stancil was prepared to go to St. Louis for training to learn more about the Gemstones from Reg so he could go out and sell them. Stancil eventually spent a couple of days with Reg, during which Reg tried to teach him about grading the finished stones. According to Stancil, two days were not enough time in which to learn, but Reg gave him some books to read.
 
 
 70
 Taurus also asked Reg to call people on his contact list and set up appointments for a sales representative in California who was working for Taurus. Id. In addition, they reminded Thompson to send the names and addresses of "two professionals whom you would recommend we contact in order to get additional appraisals on the finished material." Id. It appears Taurus was finally interested in seeking a second opinion on the value of the Gemstones.
 
 
 71
 In a letter dated April 21, 1994, Reg angrily told Goldberg about a phone call he had received from Bob Webster, Taurus's attorney, in which Webster insisted on a meeting with Reg and his lawyer. Def's Exh. X. Webster accused him of "making guarantees, refusing to work with the Taurus group in the marketing of the rubies, and not having contacted" any potential buyers. He also said that Webster told him he was in breach of the agreement and threatened to sue him. Id. Reg ended the letter by stating that if he ever got such a telephone call again he would remove himself from any further contact with Taurus. Attached to the letter was a copy of an invoice dated April 21, 1994, for a grading fee on 11,536.47 carats of finished stones, in the amount of $2,307.29. A post-script at the bottom of the copy stated that Webster said Thompson had already been paid for grading, which Thompson disputed. Id.
 
 
 72
 The next major event was Reg's April 26, 1994, letter in which he wrote, "The reason for this letter is to set the records straight, once and for all. I have lied to all of you, in retaliation for the many lies that have been told to me right from the beginning of this association." Plfs' Exh. 26. In that letter, Reg stated that when they all first sat down to discuss the venture, he advised them that they were "embarking on a market that had not yet been tested and had no track record." Id. He reminded them that what they were proposing to do was "pure speculation." Id. After briefly reciting the basis for his earlier estimates on how well he thought they could do in the market, and emphasizing the truthfulness of those estimates, Reg indicated that he has been and still was successfully selling his finished cabochons for good money. Id. Given the fact that up to that point Reg had sold none of the Taurus stones, the latter statement must have come as a shock.
 
 
 73
 Later in the letter, Reg revealed the information about the Burmese rubies flooding the market and the fact that he was disappointed with the quality of finished stones he was receiving from Thailand. He speculated that perhaps it was because Boot did not have the proper equipment, or maybe because "the material runs in streaks" and the next forty pounds will be better. "I don't know." Id. After telling Taurus the market has been depressed by the flood of Burmese rubies, Reg suggested that if Taurus had a buyer, "and this is not just another lie, I suggest that you sell the material at a price to recoup your initial investment and maybe realize a small profit." Id. He said he would still try to find a buyer, but he would devote only an allocated amount of time to Taurus's stones, because his "primary objective is still to sell [Dainty's] 4,000 pounds." Id.
 
 
 74
 Reg then indicated that he expected to receive fifty percent of the $500,000.00 earnest money that was supposed to have been in place when he traveled to New York in February to assist with selling the Dainty Stones. Denying any responsibility for the failure to complete that transaction, Thompson said he expected his share of the earnest money even if it was never there. After all, it was not his fault that Taurus failed to do "due diligence" on that transaction, he was owed the money regardless. He concluded by stating that he had been receiving "an excessive number of phone calls, misinformation, and threats of being sued. This is absolutely unnecessary and will not be tolerated." Id. He suggested that they communicate by fax instead of by phone in the future.
 
 
 75
 By May 3, 1994, Thompson was instructed by the managing partner of LEOCO, Tom Payne, to direct all future communications about the project only to Goldberg. Def's Exh. Z. In a letter from Goldberg that same day, Taurus demanded a meeting with Thompson and his counsel within five business days to "resolve all outstanding issues." Id. Copies of this letter were given to LEOCO, Jim Stancil, and Webster. Thompson's response to this demand was cordial, but firm. See Def's Exh. AA, Letter Dated May 3, 1994. He did not agree that such a meeting was necessary. Instead, he summarized the outstanding issues from his perspective. Although he had complied with all aspects of their agreements, except getting the insurance policy, Taurus and LEOCO have not complied with the agreement. Id. He claims he was told that Taurus had no intention of paying for the key man life insurance once it learned how costly it would be. In essence, he implied that his refusal to allow them to purchase a policy for him was immaterial.
 
 
 76
 Other issues that were "outstanding" according to Thompson were the selling of cabochons already cut, and at what price, the cutting of additional material, and the $250,000.00 owed to "T.L.C. Gem Labs, Inc./Bob Dainty" by Taurus. With regard to selling the cabochons, Reg stated that he had assisted Taurus with marketing them, and that their agreement did not require he devote 100% of his time to that task. He concluded with an offer to continue trying to sell the stones, but at a "much lower than anticipated price if necessary." Id. He asked for guidance in connection with the cutting of additional material. If they wanted him to proceed, they would need to send $99,790.24 to buy an additional forty pounds, and $90,718.40 for the cutting charges.
 
 
 77
 Finally, he noted that he had been promised one-half of an earnest money deposit in connection with a possible sale of the Dainty Stones in New York, which Taurus was to have verified by means of a "soft probe."[11] Although he was not making a formal demand for this share, Reg stated that he "would hope that these issues could be resolved in a business-like, professional way, without threats from either party." Id. He reiterated in the last paragraph that the "word guarantee is not in either of the agreements" he had signed. Id.
 
 
 78
 Although Reg had been instructed to no longer communicate directly with members of LEOCO, he wrote to Payne one last time to send a copy of the May 3, 1994, letter he had sent to Taurus. The letter to Payne, dated May 4, 1994, made it clear to LEOCO that Reg believed that he did not make any guarantees, even though Taurus claims that he did. He continued with,
 
 
 79
 [T]he LEOCO/Taurus joint venture was a secondary operation. My prime objective was, and is, to sell the 4,000+pounds of rough material for my client. Taurus convinced me that if I would accept the "small" order for 300+pounds, the larger order for the 4,000 pounds would follow within a matter of a couple of weeks.... LEOCO has invested a lot of money, and T.L.C. has done likewise. And, I firmly believe that we are the only ones who have invested cold, hard cash in this deal. So, unless these problems are resolved, we ... are the only ones that will lose.
 
 
 80
 Def's Exh. AB, Letter dated May 4, 1994. Reg concluded this letter with protestations that he was being blamed totally for the problems by Taurus. "My patience is wearing thin, and unless someone gets an attitude adjustment real soon, I will be forced to play "hardball." Id.
 
 
 81
 In response to these communications from Reg, Goldberg sent a lengthy letter that began, "It is immaterial whether or not you believe a meeting is necessary...." Def's Exh. AC, Letter Dated May 6, 1994. According to Goldberg, refusal to meet on demand is a "breach of the arbitration provision in both contracts," although she does not cite or quote from that provision.[12] She proceeded to outline the provisions of the two contracts that Taurus felt had been breached, and by what conduct the breach occurred. Specifically, Goldberg cited excerpts from the recital in the Thompson Contract that Thompson had developed a proprietary process for finishing rubies, and she then noted that Thompson had yet to finish one ruby with his proprietary process. Def's Exh. AC.
 
 
 82
 She also claimed he had represented in the contract, and has continually represented that Taurus would obtain a forty percent return of finished rubies from each pound of the rough material, and that they could sell it for at least $25.00 per carat. Exh. 13, p 1.3. Further, she pointed to the provisions regarding the safekeeping of Reg's proprietary process and giving Taurus access to the safe deposit box "in the event of disability or death of Thompson." See Exh. 13, p 3.3, Exh. 14, p 1.2. Such access had been denied, according to Goldberg. Citing the same provisions, Goldberg claimed that Reg refused to provide Taurus with the name of his attorney, or provide the means of contacting his wife or attorney. Consequently, should anything happen to Reg, Taurus would have difficulty exercising its right of access.
 
 
 83
 As noted earlier, Reg had refused to reveal his financial information, which both parties assumed meant he could not be bonded. Goldberg claimed that such refusal violated the bonding requirement in the contracts. See Exh. 13, p 4; Exh. 14, p 3. She also complained about Reg's refusal to cooperate in the acquisition of key man insurance, as required in both contracts. See Exh. 13, p 5; Exh. 14, p 4.
 
 
 84
 Finally, she accused him of doing nothing to assist with the marketing of the stones, much less market them himself, as she claimed was required by their contract. According to Goldberg, Reg breached the marketing provision of the contract between himself individually and Taurus, because he had not sold any stones yet. Exh. AC (citing Exh. 13, p 6). In support of this complaint she cited the following provision:
 
 
 85
 Thompson agrees to market and/or assist Taurus with the marketing of the stones to be finished hereunder. In addition to furnishing Taurus with the sales information as previously outlined, Thompson shall sell stones finished hereunder on a best efforts basis until all stones are sold. In return for such sales, Taurus shall pay Thompson a sales commission in the amount of eight (8) percent of each such sale. The expenses incurred in any sales made by Thompson shall be borne by him.
 
 
 86
 Exh. 13, p 6.
 
 
 87
 Goldberg then turned her attention to the use of the proprietary process. In the contract between Taurus and T.L.C., the latter had agreed not to reveal or give Reg's proprietary process to anyone, except for the cutting house that would be used in the project. Exh. 14, p 11. The parties had also agreed that T.L.C. would not contact LEOCO or any of its representatives without the express, written permission of Taurus. Id. As already found, Reg did contact Stancil and Payne regarding issues relating to the Taurus contracts.
 
 
 88
 Goldberg responded to Thompson's suggestion that Taurus pay him an additional sun to proceed with the cutting and finishing of another forty pounds of rough material, by stating that Taurus will proceed once Thompson has "SATISFIED THE PRECONDITIONS FOR SUCH SUBSEQUENT PURCHASE." Def's Exh. AC. Specifically, she stated:
 
 
 89
 To even suggest that we hand over an additional $190,000 when you have not yet sold even one carat of our first 41.36 pound purchase--and with no proof that the finished (and therefore the unfinished) material is saleable at any number approaching your warranties, is ludicrous.
 
 
 90
 Id. With regard to the stones shown to the potential buyer in New York, Goldberg stated that Taurus did not know at the time, although Thompson did know, that more than eighty percent of those stones belonged in the lowest two quality classes. Consequently, the price the New York buyer had offered, and Taurus had rejected, had been fair.
 
 
 91
 On another note, Goldberg mentioned that the New York buyer had felt differently about Reg's own stones that were being shown. Presumably those stones had been enhanced with his proprietary process. The implication was that it was the absence of that process which made Taurus's stones less valuable. Goldberg, apparently dissatisfied with Reg's marketing assistance, wrote the following:
 
 
 92
 That being the case, you should have told us not to show our stones in order to lock in the sale of the unfinished. Had you shown only YOUR packet of stones, the outcome might have been quite different.
 
 
 93
 Id. (emphasis in original).
 
 
 94
 Regarding Reg's claim to the alleged earnest money deposit, Goldberg noted that Reg knew before he left for New York that no deposit had been made, nor had the buyer entered any sort of written agreement with Taurus. In addition, Reg was present when a large sum of money was displayed to show the parties that the buyer was capable of completing the transaction. For Goldberg, such a display obviated the need for an earnest money deposit.
 
 
 95
 Goldberg concluded that the only way to salvage their relationship and rectify the situation would be if Thompson and his attorney agreed to meet with Taurus and their attorney. Id. A May 11, 1994, meeting was suggested. Thompson's response was negative. In a letter dated May 10, 1994, Thompson wrote,
 
 
 96
 Rather than trying to answer your absurd accusations, I have turned the whole Taurus/TLC file over to legal counsel. My lawyer will fully examine all written matter, including the agreements, and respond with his advice as to how to handle the situation that has developed between us. Should he find it necessary we will then schedule a time when you and your lawyer can meet with us ... in our office....
 
 
 97
 Def's Exh. AC. He expressed doubt that his attorney would be ready to respond by May 11, but he said he asked his attorney to "proceed with haste." Id.
 
 
 98
 Thompson's letter was faxed to Goldberg, who replied that Taurus and their counsel would be available to meet in St. Louis the following week. Id. Letter Dated May 10, 1994. However, in the next paragraph, Goldberg wrote,
 
 
 99
 On another subject entirely, Jim [Stancil] just received word from two of Cotton's people (one of whom--Bharat--is from India) that they have purchased tickets and are scheduled to arrive in St. Louis this Saturday, May 14 ... to meet with you, view your "dog and pony" show as the final step prior to determining whether to proceed with an offer to purchase a major portion of the unfinished material.
 
 
 100
 Id. In a "business as usual" response, Reg suggested an alternative time to meet the potential buyers. In the next paragraph, however, he disputed Taurus' accusation that he had guaranteed a specific return on the Gemstones. Reiterating that all he had done was speculate and anticipate certain figures, given market conditions at the time, Reg stated that everything "goes out the window" when the market changes. Id.
 
 
 101
 These letters were followed by a series of fax transmissions as Taurus and Reg attempted to arrange a time for meeting with the potential buyers. It is not clear which Gemstones were being offered, Taurus's stones or Dainty's. Nevertheless, the meeting apparently did not occur, because the next communication from Taurus was a letter asking Thompson to send all the finished rubies in his possession to them in anticipation of a meeting they had scheduled for June 15, 1994. In response, T.L.C. sent a second invoice for grading the remainder of the Taurus material, in the amount of $5,008.09. Def's Exh. AC.
 
 
 102
 Thompson indicated that he would be happy to ship the 25,040.47 carats of finished cabochons he had to Taurus upon receipt of their payment for the grading fees for these stones and the stones that were delivered to Stancil in April, 1994. Additionally, he noted that three of his ruby cabochons had been sent to Taurus for showing, and had not been returned. He estimated their value at $2,584.50, and he asked for either payment in full or return of the rubies. He also asked for reimbursement in the amount of forty-five dollars ($45.00) for a powder scale. Taurus quickly faxed Thompson to protest having to pay the grading charges before the first sale of Gemstones had been completed, as they had previously agreed.
 
 
 103
 Thompson acknowledged that he had agreed to defer the grading charges until a sale was completed, but once Taurus asked to have all the finished stones sent to them, the situation had changed. Def's Exh. AF, Letter Dated June 13, 1994. He would not release the stones until the grading fees were paid. Taurus expressed reluctance to pay for grading rubies that Thompson had said were poorly finished, and wondered why he had gone to the trouble of grading stones he had suggested be "dumped." Def's Exh. AE.
 
 
 104
 In response, Thompson contested having said anything about the quality of finish on the stones. Rather, he clarified that he was referring to the quality of the stones themselves, not the finish. Id. Moreover, because no one from Taurus told him to stop grading stones, he continued to do so and he expected to be paid for his work. Def's Exh. AF. Referring to recent discussions with Thompson, Goldberg indicated her hope that he would have applied his proprietary finish to the Taurus stones. She wrote,
 
 
 105
 Apparently that is not the case. Upon further reflection, therefore, we do not want the 25,040.47 carats shipped to us until they are properly finished utilizing your process, since that is what we paid for.
 
 
 106
 Def's Exh. AE. If Reg could sell the stones at an average price of $25.00 per carat without the finish, Goldberg stated, Taurus would be happy to forego that process. However, she made it clear they expected that rate of return on their investment. Id.
 
 
 107
 With respect to Taurus' insistence that he apply his proprietary finish to the rest of their stones, Thompson said he never agreed to do that. Then he wrote,
 
 
 108
 they are as finished as they are going to get. You did not specifically pay for my process. You paid to have the stones cut by the best cutter I knew, and for me to teach him my finishing process so that subsequent batches would be finished with my process.
 
 
 109
 Def's Exh. AF. He again refuted any statement that could have been taken as a guarantee as to the value of the Gemstones. He pointed out that the agreement calls for him to sell the stones on a best efforts basis, which he interpreted to mean that he could sell the stones for whatever price he could get, even if less than $25.00 per carat. If Taurus was opposed to that, he suggested they pay him the grading fees, take the stones and do the selling themselves. Id.
 
 
 110
 Meanwhile, Taurus was continuing to attempt to arrange a meeting in New York with new potential buyers that Stancil had located, and Goldberg said she was "baffled" by Reg's news that he was going away for two weeks. Def's Exh. AE. After expressing his irritation about Taurus' lack of communication with him regarding their potential buyer and the need for him to be available, Thompson drew his line in the sand. Def's Exh. AF. He wrote,
 
 
 111
 Your comment about the lack of a final finish is incomprehensible to me. You can hope all day long that I would take my valuable time and refinish all of your stones, but nobody ever verbally expressed that "hope".
 
 
 112
 The "finish" on the stones, as they sit, is very good as compared to other cutters. Actual time for me to refinish each stone would only be a matter of a few seconds. However, preparation time to get the stone ready for refinishing would be a matter of several minutes.
 
 
 113
 Id. He concluded by estimating that to refinish all of Taurus's stones in his possession would take approximately 1,333.33 hours, and at forty hours a week, that would be thirty-three weeks. Id. According to Thompson, his fee for cutting and finishing gemstones is $50.00 per hour, so if Taurus would send him $66,666.65, he would start refinishing the stones. Id.
 
 
 114
 Needless to say, Goldberg's response to this letter was not positive, although no copy of it was in evidence. It drew an angry fax from Reg that began, "I am tired of wasting my time in answering your derogatory FAXes. I will not allow your misinterpretation of the agreements to put undo [sic] pressure on me." Def's Exh. AF, Fax dated June 14, 1994. In this communication, Reg indicated that he would find a buyer for Taurus's stones when he returned from his trip, and sell the stones at whatever price he could get, deduct his charges and commission, and forward the balance to Taurus. He repeated that if Taurus wanted better control over the price, they should pay him and retrieve the stones. Id.
 
 
 115
 Goldberg's next letter continued to work out the details of a possible meeting with Bharat, the potential buyer from India, and Reg in New York. On June 15, 1994, she informed Reg that Bharat was prepared to purchase the "rough" (meaning Dainty's Stones) for $3,000,000.00, pending examination of same. She asked for confirmation that this price was acceptable to Dainty. Reg wrote back that the lowest price Dainty had said he would accept was $3,600,000.00, but Reg would talk with him. Def's Exh. AF, Letter Dated June 16, 1994. He ended with, "I will do my best ... to get answers to you as quickly as possible." Id. Dainty decided that $3,600,000.00 was the lowest price he would accept, but offered to hold the material exclusively for a fifty percent (50%), non-refundable deposit. Def's Exh. AF, Letter Dated June 23, 1994. Regardless, Reg insisted that a $4,000.00 non-refundable deposit be transferred to him before he and Dainty would make another trip to New York. Id.
 
 
 116
 The details must have been worked out, because on or about July 5, 1994, the parties signed an agreement for the sale of the Dainty Stones to Taurus for $3,600,000.00. Plf's Exh. 31. The sale was contingent on Taurus's representatives being satisfied upon inspection that the stones in the vault were of the same quality as the ones they had seen in St. Louis. Def's Exh. AG, 11 1-3; Plfs' Exh. 31. In addition, the contract provided that Taurus would pay Reg another $250,000.00 for his proprietary process, subject to a ninety-day, money-back guarantee of "satisfactory results." Id. Another provision required Thompson and T.L.C. to agree that they would have no contact, transfer any information to, or transact any business with Bharat Kothari, Group Artec, James Azlein, or C.E.G.I., Inc., without the express written permission of Taurus.
 
 
 117
 A second agreement between Reg and Taurus was also entered on or about July 5, 1994, in which the parties agreed to the sale of the Dainty Stones to Taurus for $3,600,000.00. That agreement allowed Taurus to buy the remaining three hundred pounds of Reg's material for a total of $200,000.00 at the same time. Plfs' Exh. 30. This second agreement was only in effect until July 30, 1994. Several August communications revealed that the sale did not occur, including a disappointed fax transmission from Reg to James Azlein and Bharat Kothari, dated August 15, 1994. Apparently a planned telephone conference call had not occurred, which Goldberg had attributed to Azlein and Kothari being unavailable.
 
 
 118
 According to Reg, he had made himself available for such a call since July 14, 1994, and he was "not a happy camper." Def's Exh. AG, Fax Dated August 15, 1994. He said that he could no longer prevent Dainty from selling five hundred pounds of stones to another buyer, and warned that unless he heard from them that afternoon, the deal would be off. The next communication of record is one from Reg to Goldberg, in which he stated that he must talk with Bharat that day and set a schedule for going to New York to view the stones. Def's Exh. AG, Fax Dated August 16, 1994. He indicated that he and Dainty would no longer allocate any time to a deal with Bharat if this request did not yield some results. Id. He concluded with, "I want to see this deal go thru, but so far we are on a dead-end street. Please call me so we can work it out for both of us." Id.
 
 
 119
 Apparently the parties worked it out and made that trip to New York, as revealed in the next communication. Reg wrote to Goldberg that he would not be responsible for the cost of trips to New York that did not result in a sale. Consequently, he demanded reimbursement for the trips to New York in February and in August, 1994. Def's Exh. AH, Letter Dated August 24, 1994. The total amount of money being claimed for his expenses, his grading fees and the three cabochons that belonged to Thompson and were sent to Taurus, was $12,408.78. Id. That is the amount still being sought by Thompson's counter-claim in this action. Nevertheless, Reg continued to express a willingness to travel to New York a third time in an effort to consummate a deal for selling the Dainty Stones. Id.
 
 
 120
 By August 31, 1994, Reg was informed by Dainty that he would not sell his stones to Taurus, Peg Goldberg, or anyone having anything to do with either of them. Def's Exh. AI, Fax Dated August 31, 1994. Reg advised Goldberg to pass the information on to Stancil and Bharat "so that they don't spend any more money on this project. I am closing my files." Id. Finally, he stated that if Taurus wanted to get the rest of their 25,600 carats of finished stones, they would have to first send him $12,408.78. If they did not pay him within thirty days, he planned to sell the stones for whatever he could, deduct what Taurus owed him, and send them the rest, if any is left. Id.
 
 
 121
 The tone of their communications did not change throughout September, 1994, with the exception that on September 8, 1994, Reg wrote to Taurus that they have "defaulted and failed to perform material obligations" of their November, 1993 agreements. Def's Exh. AI, Letter Dated September 8, 1994. He also accused Taurus of entering agreements with third parties by stating that Thompson had guaranteed prices and quantities. Id. "I did not guarantee anything, and the use of my name and credentials to obtain these agreements with the other parties is a blatant case of fraud." Id. Consequently, Thompson gave Taurus thirty days to pay what they owed him or their agreements would become "null and void." Id. In addition, he notified Taurus that he had placed a "mechanic's lien" on the 25,600 carats still in his possession, pending receipt of their payment.
 
 
 122
 On September 14, 1994, Thompson provided Taurus with an exact appraisal report based on his grading of all of the stones that had been cut and finished from the first batch of 41 pounds. Of five quality classes, the stones sorted into the following categories:
 
 
 123
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE
 
 124
 Def's Exh. AJ, Letter Dated September 15, 1994. Taurus wrote back that they would not authorize him to sell their stones, which by his appraisal have a wholesale value of $428,538.78, for a mere $12,408.78. Def's Exh. AJ, Letter Dated September 21, 1994. Instead, they offered to let him keep 167 carats of the class II material, the average value of which would be $75.00 per carat according to Thompson, "as a means of more than satisfying your claim." Id. This action was filed on October 4, 1994.
 
 III. LEGAL DISCUSSION AND CONCLUSIONS
 A. Contract Interpretation
 
 125
 The essential elements of a breach of contract action are existence of the contract, breach, and damages caused thereby. Fowler v. Campbell, 612 N.E.2d 596, 600 (Ind.Ct.App.1993). Neither party has contested the formation of a contract between them. Thus, the Court finds that an enforceable contract existed between Taurus and Reg and between Taurus and T.L.C. What is disputed is whether the contracts were breached, and, if so, whether damages resulted therefrom. Before the Court is able to decide if Reg or T.L.C. breached the contracts entered with Taurus, it must determine the meaning of the agreements.
 
 
 126
 Two contracts were entered in late 1993, one with Reginald Thompson personally, because he was the owner of approximately 320 pounds of gemstones, and one with his corporation, T.L.C. Gem Labs, Inc. (although the contract submitted in evidence as Exhibit 14 recites that it is with "Thompson Lapidary Company"). The latter contract seems to have been entered for purposes of acquiring services for finishing and grading "of all the rubies" from T.L.C., or from another cutting house under Thompson's supervision. Plfs' Exh. 14.
 
 
 127
 A third contract was entered on July 5, 1994, between Taurus and Reginald Thompson, the purpose of which is not entirely clear. In it the parties agreed that Reg had a power of attorney from Dainty, that Dainty was the owner of the stones, and that Reg was authorized by Dainty to conclude the sale of the stones. Plfs' Exh. 31. This contract also allowed Taurus to buy from Reg the approximately 4,400 pounds of "mine run rough ruby corundum" (the Dainty Stones) for $.44 per carat, subject to a prior sale. It also required payment in full be transferred to Reg "within 12 banking days following inspection and approval in New York." Another, much shorter, contract entered at the same time seems to be the actual contract for the sale. See Def's Exh. AS.
 
 
 128
 The parties have been unclear during their testimony and briefing as to which contracts and which stones they were referring at any given time. Perhaps they were also unclear during their course of dealing with each other, which may suggest why they are involved in the current litigation. However, all of the contracts were drafted by Taurus, or its counsel, and if any ambiguities are found, the terms that are unclear should be strictly construed against the drafter. See INB Banking Co. v. Opportunity options, Inc., 598 N.E.2d 580, 582 (Ind.Ct.App.1992). The Court construes contracts as a matter of law, and resolves any ambiguities with reference to accepted rules of contract construction. Id.
 
 
 129
 The primary purpose of contract construction is to determine the "mutual intention of the parties." Hutchinson. Shockey, Erley & Co. v. Evansville-Vanderburah Cty. Bldg. Auth., 644 N.E.2d 1228, 1231 (Ind.1994). Such intent is discerned as of the time the contract was made and by considering the language used by the parties to express their rights and duties. INB Banking Co., 598 N.E.2d at 582. If the contract itself fails to make its meaning clear the court may consider the circumstances surrounding its formation. See American Fletcher Mortg. Co., Inc. v. Cousins Morta. and Equity Investments, 623 F.2d 1228 (7th Cir.1980). Oral statements by the parties of what they subjectively intended, however, are not admissible in determining intent. See Real Estate Support Serv. v. Nauman, 644 N.E.2d 907, 910 (Ind.Ct.App.1994). In fact, the "cardinal rule of contract interpretation is to ascertain the intention of the parties from their expression of it." Id.
 
 
 130
 The first step in discovering intent is to gather meaning from the "four corners" of the written document. Kutche Chevrolet-Oldsmobile-Pontiac-Buick, Inc. v. Anderson Bank. Co., 597 N.E.2d 1307, 1309 (Ind.Ct.App.1992). Courts must give words their plain and usual meaning, unless review of the contract as a whole reveals some other meaning was intended. INB Banking Co., 598 N.E.2d at 582. Words must be considered in context, and terms considered in relation to other terms in the contract. Id. If the meaning is not apparent from the plain language, the court may apply rules of construction and consider extrinsic evidence. Id. When reasonable persons could gather more than one meaning from the language, which meaning would require the consideration of extrinsic facts, then the term is ambiguous and interpretation would require factual determinations. Id.
 
 
 131
 "Whether it is reasonable to expect an agreement to be reduced to writing depends in part on the sophistication of the parties and the kind of bargain that is negotiated." Kinko's Graphics Corp. v. Townsend, 803 F.Supp. 1450, 1457 (S.D.Ind.1992). Even if the objective intent of the parties was to enter an agreement without committing it to writing, their oral agreement must demonstrate "mutual assent" to be valid. Id. at 1458. If a material term does not express mutual assent, that is a fatal flaw. Id. Moreover, an agreement merely to make an agreement is unenforceable. Id.
 
 
 132
 Reg has said that getting the Dainty Stones sold was his primary objective, and that effecting such a sale was a condition Taurus had to perform before he would be required to use his proprietary finish on the stones Taurus bought from him. Goldberg said that the application of Reg's proprietary process was a necessary element of the contract and that Taurus would not have entered a contract with Thompson if use of the process was not part of the deal. Goldberg Trial Test., Direct-exam. Reg's claimed purpose for entering a contract with Taurus to sell his own stones was to "get the ball rolling" and to "develop a track record for the gems." Thompson Trial Test., Direct-exam. Given that the parties chose to express their agreement in writing, which is reasonable considering the nature of the transaction, these oral statements of what each side subjectively intended the contract to mean provide little guidance. Instead, the Court will examine the language of each written agreement.
 
 1. The Thompson Contract
 
 133
 The contract between Reg and Taurus specifically claims as its subject matter the purchase by Taurus of "+/-three hundred (320) pounds of the rubies from Thompson in twenty (20) pound increments at the same price per carat as previously negotiated." Plfs' Exh. 13, p 1.1. Although no price was stated in this contract, the parties both signed a letter agreeing that the price for this transaction would be "$1.10 per carat or the sum of $49,895.00 per twenty pound increment." Complt. Exh. C, Letter Dated November 22, 1993. In addition, the contract states that "Thompson agrees to cooperate with Taurus and its clients to assist them in acquiring the additional Rubies stored in Long Island at a price and acquisition schedule to be mutually negotiated." Plfs' Exh. 13, p 1.2. It does not state that Taurus was obligated to acquire the additional stones, nor does it make such acquisition a condition precedent to any of Reg's obligations.
 
 
 134
 Finally, the subject matter section contemplated that, "based on his personal evaluation of the material ... Thompson concurs that he would anticipate a minimum yield of forty (40) percent of finished carats, with an average wholesale price per carat of twenty-five (25) dollars." Plfs' Exh. 13, p 1.3. By concurring that he would anticipate a certain result, Reg did not guarantee such a result. In fact, as evidenced by the Warranty of Gemologist drafted by Taurus and signed by Thompson in February, 1994, it is clear that if a guarantee had been intended, the parties knew very well how to affirmatively express it.
 
 
 135
 Although not specifically argued by Taurus, the Court will consider whether this representation as to the anticipated market value of the gems created an express warranty. An express warranty is created when any affirmation of fact, or promise made by the seller to the buyer, relates to the goods and becomes part of the basis of the bargain. See Ind.Code § 26-1-2-313(1)(a). The buyer has the burden of establishing that both parties understood and agreed to the same thing, before an express warranty can be proven. Richards v. Goera Boat and Motors. Inc., 384 N.E.2d 1084 (Ind.App.1979). That means that if both parties did not rely on a certain assertion or opinion to be a part of the deal, no express warranty was created. Moreover, an affirmation "merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Ind.Code § 26-1-2-313(2).
 
 
 136
 Here, Taurus claims that Thompson made numerous "guarantees" as to the value of the gems and to an expected rate of return on their sale. The only evidence presented on that issue was Goldberg's testimony, during which she interpreted as guarantees certain language that had been conditioned on the present market values. Thompson, on the other hand, offered evidence both that he told the plaintiffs that selling gemstones was a speculative venture, and that he stated in writing that he was not making a guarantee.
 
 
 137
 For example, the appraisal for the Wansa stones that Goldberg repeatedly claims induced her to enter the contract with Thompson includes the following language:
 
 
 138
 the values and description as listed in the appraisal [are] correct to the best of our knowledge and belief based on present day market values .... because jewelry appraisal and evaluation is not a pure science, but rather a subjective professional viewpoint, estimates of value and quality may vary from one appraiser to another with variances not necessarily constituting error on the part of the appraiser. Therefore due to the very subjective nature of appraisals and evaluation, statements and data contained herein cannot be construed as a guarantee or warranty. We assume no liability with respect to any action which may be taken on the basis of this appraisal, or for any error in, or omission from this report.
 
 
 139
 Def's Exh. AR, Certificate of Appraisal (emphasis added). This language contains an express disclaimer of any warranty, which should have put Taurus on notice of the absence of any guarantees. See Thacker v. Menard. Inc., No. 96-2651, slip. op. at 7 (7th Cir. Jan. 28, 1997) (plaintiffs could not reasonably expect to rely on oral representations that contradict the express disclaimer).
 
 
 140
 In addition, the language drafted into the Thompson Contract by Taurus, and pointed to as a warranty, is limited by certain qualifications. It is based on Thompson's "personal evaluation" of the material, and it states that Thompson "concurs that he would anticipate" a certain minimum yield of usable stones, with a stated average wholesale price. The former recalls the disclaimer in the appraisal, and the latter can only be interpreted as a compromise between the parties. Apparently, Taurus wanted to put a warranty in the contract, but Thompson would not agree to sign it. Reconciling both of these statements, the Court finds that no promise that the stones would yield a specific return formed the basis of the bargain between Reg and Taurus. An insufficient amount of evidence has been presented that Thompson agreed that a certain return would be achieved, nor did Taurus make that an essential part of the contract by specifically including it in the written agreement. Consequently, the Court finds that a guarantee of a specific return from the sale of Thompson's stones was not part of the contract between Reg and Taurus.
 
 
 141
 Other provisions in the Thompson Contract obligated him to allow the inspection of the rubies by Taurus and the joint bagging and sealing of the stones by both parties. Plfs' Exh. 13, p 3.1. Reg was also to "make available [certain information] in a written format acceptable to Taurus' attorney," which information was to be kept in a safe-deposit box and immediately conveyed to Taurus in case Reg died or became disabled.[13] Thompson agreed to be bonded and to provide Taurus with proof of such bonding so long as Taurus paid for the bond. Id. p 4. Likewise, he agreed to allow Taurus to procure key man insurance on him, but the annual premium was to be paid by Taurus. For its part, Taurus agreed to purchase the 320 pounds of rubies in twenty pound increments, to make payments by wire transfer, or other mutually acceptable means, and to pay for the bond and insurance policy required of Thompson. Id. p 2.
 
 
 142
 Reg also agreed to "market and/or assist Taurus with the marketing of the stones to be finished hereunder." Plfs' Exh. 13, p 6. Although this contract does not otherwise elaborate on the meaning of "finished hereunder," nor does it require any finishing of the rubies, it is evident that Reg's marketing efforts were to be directed at the stones being purchased from him pursuant to the Thompson Contract. The marketing provision also required Reg to sell the stones on a "best efforts" basis until they were all sold. Id. Taurus was likewise obligated to pay Reg an eight percent (8%) commission on any sales he made. Id.
 
 
 143
 In connection with any sales made by him, Reg was required to pay his own expenses, but the Thompson Contract is silent about who would pay his expenses if a sale were not made. Nothing in this provision would require Taurus to reimburse those expenses. Nor would that be a reasonable interpretation of the contract. Instead, a reasonable interpretation is that all of Reg's expenses in connection with the sale of Taurus's Gemstones should be borne by him, unless Taurus agrees otherwise at the time the expenses are incurred. Thus, if Taurus asked Reg to fly to New York to show their stones and he in turn asked them to pay him expenses, Taurus would be free, but not obligated, to do so. On the other hand, if a sale were consummated as a result of the trip, Reg would be required to pay his own expenses.
 
 
 144
 The parties also disagree over the requirements imposed on Reg by the marketing provision in the Thompson Contract. As the Court has already noted, Reg was to assist with marketing the stones, which means that he was to provide information to Taurus or its agents about the market and how to sell stones in it. Alternatively, Reg could actively market or promote the stones himself. The use of "or" implies that Reg had the option about which he would do. To the extent Reg was required to actually sell the stones, that obligation was qualified by the statement that he use his best efforts to do so.
 
 
 145
 Analytically, and practically, a distinction exists between agreeing to sell, and agreeing to use one's best efforts to sell. If a person agrees to sell, and does not succeed, he or she is liable for that failure, but if a person agrees to use best efforts to sell, and does not succeed, an inquiry into the quality of the effort is required before he or she could be held liable. Essentially, the parties here had agreed to allocate to Taurus the risk of a failure to sell, provided Reg had used his best efforts. If they had intended otherwise, they would have required Reg to sell the stones until they were all sold, without the qualifying language. Consequently, determining whether Reg breached this provision will require evaluation of his efforts, rather than merely the result of those efforts.
 
 2. The T.L.C. Contract
 
 146
 The second contract, between Taurus and T.L.C. Gem Labs, Inc., claimed as its subject matter the "grading and finishing of all the rubies," by T.L.C. or its cutter under Thompson's supervision. Neither of the terms (grading or finishing) was defined in the contract, but the meaning of grading is not contested. The term finishing, however, apparently meant different things to T.L.C. and Taurus. Likewise, reasonable persons could gather more than one meaning from that term, which makes it ambiguous. Thus, the Court must interpret its meaning from the text, if possible, and the surrounding circumstances and extrinsic facts, if necessary.
 
 
 147
 The surrounding text provides a clue as to what the parties meant by this term. In the provision relating to payment, Taurus agreed to pay $2.00 per carat for the cutting and polishing of all the rubies, without mentioning the term finishing. This language implies that the two words, polishing and finishing, were meant to be used interchangeably. Within the subject matter paragraph, however, the very next provision refers to Thompson's proprietary process, although it does so only in connection with its preservation in a safe place should Thompson die or become disabled. Its juxtaposition next to the requirement that T.L.C. finish the rubies suggests an inference that the parties meant for T.L.C. to use the proprietary process to finish the stones. Nevertheless, three facts prevent the Court from drawing that inference.
 
 
 148
 First, all of the other provisions aimed at imposing a specific obligation on Thompson contain unequivocal expressions of that intention. For example, the provision under consideration states that "Thompson agrees to make available" the information about the cutters and the proprietary process. Other examples include, "Thompson will introduce representatives of Taurus to his counsel," or "Thompson/TLC agrees to be bonded." Plfs' Exh. 14, pp 1, 3. Similarly, the other contract, between Reg individually and Taurus, also demonstrates Taurus's ability to clearly draft specific obligations in unmistakable language.
 
 
 149
 It follows, then, that by claiming the "finishing and grading" of all rubies by T.L.C. as the subject of this contract, the parties did not intend to impose an obligation on Thompson to employ his specific process for finishing the stones. Further, by only mentioning Thompson's process in a description of the information to be stored in a safe deposit box, the contract does not manifest a clear intention for that process to be the centerpiece of the agreement. Instead, the focus of the agreement is the grading and finishing of the stones by or under the supervision of Thompson.
 
 
 150
 Second, during implementation of the agreement, the parties did not act in a way that is consistent with such an interpretation. Instead their actions reflect an understanding that applying Thompson's proprietary process to the first forty pounds of stones being cut in early 1994 was not essential to the contract. This is reflected in a March 8, 1994, letter to Goldberg, in which Thompson informed her that his cutter was expecting an order for 1,000 pounds of stones before he could "justify increasing his manpower, or expenditure for new equipment," that would allow him to "better conform with my way of finishing the stones." Plfs' Exh. 21. Goldberg's response did not mention the fact that no proprietary process would be applied to the first forty pounds of stones. Def's Exh. U, Letter Dated March 13, 1994. Instead, she discussed concerns about delays in the projected time schedule for completing sales of the finished stones and about "when the money would begin to flow back to us." Id. What was essential to the agreement, then, was getting the quickest cutting and finishing job possible so the stones could be sold.
 
 
 151
 In fact, Goldberg further revealed her acceptance of the status quo with respect to the finish of those first stones when she wrote, "All of us assumed that there might be some bugs to work out the first turn, getting the cutting house trained, shipment delays, etc." Id. Of greater concern to Taurus, however, was the fact that Reg was not selling the finished stones he had received according to the projected schedule Taurus had given to LEOCO. These letters further support the inference that the essence of the parties' agreement was to mutually work to keep the Gemstones moving through the economy and to share in the profits from the sales transactions.
 
 
 152
 Third is the fact that in a subsequent agreement the parties expressed a clear intention with respect to mandatory use of the proprietary process, which implies that they did not intend such a mandate earlier on. Plfs' Exh. 31, pp 7, 8. In the July, 1994, contract for the sale of the Dainty Stones, the parties agreed that "Thompson will sell the [proprietary] process to Taurus pursuant to the terms set forth below." Id. p 7. The terms included a provision that "Taurus shall pay Thompson the sum of two hundred fifty thousand dollars ($250,000) for the [proprietary] process...." Id. p 8. These provisions leave no doubt that use of the proprietary process was contemplated as an essential part of this later contract.
 
 
 153
 In contrast, the contract between T.L.C. and Taurus for finishing the stones only mentions the process in passing. Moreover, during the trial, testimony was received that finishing meant polishing the cut stones, but not any specific method of doing so. Based on the text of the contract and the surrounding circumstances, the Court finds that the term "finishing" in the T.L.C. Contract was not limited to using Thompson's proprietary process. Thus, the mandatory use of Thompson's proprietary process on all of the Gemstones to be finished by T.L.C., or under Thompson's supervision, was not required by the contract between T.L.C. and Thompson dated November 19, 1993.
 
 C. Both Contracts
 
 154
 Finally, the Court must construe the contracts to determine precisely what conditions had to be met before either party was required to perform. Central to this dispute has been the contention by Thompson that Taurus was required to buy the Dainty Stones before Thompson would be obligated to apply his proprietary process to the Gemstones. Since the Court has found that Thompson was not obligated to apply that process to any particular stones, this dispute is of less importance. Nevertheless, in the interests of thoroughness, the Court will consider this contention.
 
 
 155
 Thompson can point to no language in any written agreement between himself and Taurus that would suggest that Taurus agreed to such an obligation. The Thompson Contract provided that Reg would "cooperate with Taurus ... to assist them in acquiring the additional Rubies," but it did not obligate Taurus to do so. Instead, what appears to have happened is that Taurus, who wanted to avoid being stuck with a large batch of stones just as much as Thompson did, was able to continually purchase the right to buy Dainty's Stones, without becoming obligated to actually buy them.
 
 
 156
 At most, Taurus became obligated to buy those stones on July 5, 1994, when Thompson/Dainty "agreed to sell the 4,400+/pounds" of stones to Taurus for $3,600,000.00. Def's Exh. AS. That agreement, set to expire on July 30, 1994, was accompanied by another agreement in which Taurus or its authorized representatives had the right to inspect the rough material in New York, to "verify the quantity and quality of product at the vault." Plfs' Exh. 31, p 2. This other agreement allowed Taurus out of the deal if "Taurus' representatives are not satisfied with the results of said inspection." Id. Assuming Taurus' representatives were satisfied and Taurus became obligated to buy, nothing in either agreement directly relates the use of Thompson's proprietary process to the sale of Dainty's Stones.
 
 
 157
 The Court finds that the Thompson Contract dated November 19, 1993, merely contemplated that Taurus would acquire the Dainty Stones in the future, but did not require them to do so. At most it was an agreement to negotiate a future agreement, which is not enforceable. The subsequent agreement, dated July 5, 1994, in which Reg and Dainty agreed to sell the Dainty Stones to Taurus for a specific amount, did not provide a connection between Taurus' obligation to buy and Thompson's obligation to use his special finish. Even if such a connection existed, the July contracts allowed Taurus to back out of the deal if an inspection of the stones did not yield a satisfactory result. Consequently, for those contracts to have obligated Taurus to buy the stones, the Court would have to find that the inspection of the stones was satisfactory.
 
 
 158
 Such a finding cannot be made, however. At trial, Stancil testified that during the last trip to New York to inspect the stones, presumably in July or August of 1994, Reg was unable to get into the vault. Other testimony indicated that the last deal to buy the Dainty Stones fell through because an official of the Indian government demanded a bribe in order to approve the transaction. Azlein Tr. Test. Direct-exam. Because that demand was not met no appraiser was sent to New York to meet Reg and inspect the stones. See, Def's Exh. AH, Letter Dated August 24, 1994. Perhaps both events occurred. Regardless of the reason, the inspection did not produce satisfactory results within the contract period, and the Court finds that Taurus was not obligated under the July 5, 1994, agreement to buy the Dainty Stones.
 
 
 159
 Another condition over which the parties disagree is whether Taurus should have to pay Thompson for the grading of the finished carats of Gemstones obtained from the first batch of rough material. As already noted, the T.L.C. Contract specifically required Taurus to pay a certain amount per carat for grading of the finished cabochons. The evidence is that Thompson completed the grading once all of the material had been sent from Thailand, and subsequently he sent a report to Taurus. See Def's Exh. AJ, Letter Dated September 14, 1994. In the T.L.C. Contract the parties had agreed to a $.30 per carat fee for grading by T.L.C. When Thompson sent Taurus an invoice for grading part of the first batch, however, it reflected a charge of $.20 per carat for the service. See Def's Exh. Y, Invoice Dated April 21, 1994. Subsequent invoices reflected the same fee per carat. See Def's Exh. AC, Invoice Dated June 9, 1994; Def's Exh. AD, Letter Dated June 13, 1994; Def's Exh. AH, Letter Dated August 24, 1994. Based on this evidence, the Court finds that Taurus agreed to have T.L.C. grade the finished stones, and T.L.C. agreed to a reduced fee of $.20 per carat.
 
 
 160
 Because Taurus did not dispute the amount of the grading charges, nor have they pointed to any evidence that the grading was not performed, the only issue that remains is whether Taurus is excused from paying for grading stones they allege cannot be sold. The answer to this question is found in the language of the T.L.C. Contract, which is straightforward and clear: "finishing and grading of all the rubies shall be performed by T.L.C." Def's Exh. 14. No provision of that contract conditions the payment for grading on the successful sale of the stones. Instead, the contract states that "Taurus shall pay the sum of $.30 per carat to TLC for the grading of all finished material." Id.
 
 
 161
 Possibly Taurus is relying on a subsequent agreement by Thompson to defer payment of the grading fees until a sale was completed. That agreement, however, was implicitly conditioned on the stones remaining in Thompson's possession while he attempted to sell them. It was structured so that Thompson would retain the amount owed him for grading, along with his eight percent commission, from the proceeds of any sale. Once Taurus demanded the release of the stones, as they now have, Thompson was entirely justified in expecting the grading fees to be paid.
 
 
 162
 Moreover, at no time did Taurus instruct T.L.C. to stop grading the finished stones, or to refrain from grading them as they arrived from Thailand. In fact, the T.L.C. Contract required both the finishing and grading of the stones, which means that T.L.C. would have been in breach of the agreement had Thompson not graded them. In addition, Taurus requested and obtained reports of the results of the grading, ostensibly to use while trying to sell the Dainty Stones. Therefore, the Court finds that Taurus remains obligated to pay T.L.C. for the grading of the finished stones before Reg will be required to release those stones to Taurus.
 
 B. BREACH OF CONTRACT
 
 163
 According to Taurus, Reg has breached the contract between them by not selling any of Taurus' rubies, by refusing to get a bond, and by failing to cooperate in the acquisition of key man life insurance. These are the three primary grounds on which Taurus bases its breach of contract claim. Reg is also accused of attempting to ruin the relationship between Taurus and LEOCO, of refusing to disclose his attorney's name and address, of failing to provide access to his safe deposit box, of refusing to allow the inspection of the rough material, and of being generally uncooperative.
 
 
 164
 In addition, Taurus asserts that Reg presented unsubstantiated bills for reimbursement of travel expenses and for grading stones, he recanted his "guarantees" about the stones, failed to apply his proprietary process to the first batch of stones, refused to assist with selling the stones, and concealed critical market information from Taurus.
 
 
 165
 To prevail on a breach of contract claim, the plaintiff must prove the existence of a contract, that it was breached, and that damages resulted. Fowler v. Campbell, 612 N.E.2d 596, 600 (Ind.Ct.App.1993). Because the parties do not dispute the existence of a contract, the Court will focus on whether a breach occurred, and if so, whether any damages resulted from that breach. Primarily there are two ways a contract is breached: 1) by failing to perform a contractual duty when it comes due, Rauch v. Circle Theater, 374 N.E.2d 546, 552( Ind.App.1978); or 2) by repudiating the contract, either after partially failing to perform, or by anticipatory repudiation before performance is due, Page Two. Inc. v. P.C. Management, Inc., 517 N.E.2d 103, 106 n. 2 (Ind.Ct.App.1987). For repudiation to constitute a breach it must be positive, absolute and unconditional, whether done expressly by words or writing, or through conduct. Eden United, Inc. v. Short, 573 N.E.2d 920, 929-30 (Ind.Ct.App.1991).
 
 
 166
 The burden of proving damages as a result of an alleged breach rests with the plaintiff. Rauch, 374 N.E.2d at 553. Even if a breach has been shown, if the plaintiff can prove no injury resulting therefrom, the plaintiff will not be entitled to recover damages. Id. Causation in fact must be shown, which means that the breach must have been a substantial factor in bringing about the harm. Parke State Bank v. Akers, 659 N.E.2d 1031, 1034-35 (Ind.1995); Fowler, 612 N.E.2d at 601-02. If causation is demonstrated, a plaintiff may recover the "benefit of his bargain," limited to the loss actually suffered. Fowler, 612 N.E.2d at 603. The damages claimed must be the natural, foreseeable and proximate consequence of the breach. Id.
 
 
 167
 Turning to the case at hand, certain allegations of breach are negated merely by the Court's interpretation of the contracts at issue. That includes the allegation that Reg breached the contract by not selling any of Taurus's rubies. To prove such a breach Taurus would have to present evidence that Reg did not in fact use his best efforts to sell. No such evidence was presented, and thus Taurus has failed to prove breach on this basis.
 
 
 168
 Likewise, the claims that Reg presented unsubstantiated bills for travel and grading, that he recanted his guarantees, that he failed to apply his proprietary process on the first batch of stones, and that he concealed critical market information, fail as a result of the Court's interpretation of the contracts. With respect to the travel expenses, the Court has found that Reg was responsible for any expenses incurred in connection with the sale of Taurus' stones. The expenses at issue, however, are related to efforts to sell the Dainty Stones, albeit using Taurus' and Reg's own stones as samples. Those expenses were not the subject of any written contract between the parties and no evidence has been offered to establish the existence of an oral agreement regarding who should be responsible for those expenses. Consequently, the fact that Reg presented those expenses to Taurus does not constitute a breach of the contracts at issue.
 
 
 169
 Because the Court has already found that Thompson did not guarantee to Taurus that it would receive any specific return on its investment, the fact that he subsequently clarified that position does not constitute breach. In fact, during her testimony, Goldberg admitted that the Warranty of Gemologist Thompson signed was prepared by her in connection with the Dainty Stones. Goldberg Tr. Test., Re-Direct-exam on Exh. 18. Her subsequent effort to point to that warranty as evidence of Thompson's guarantees to Taurus are unavailing. Nor can the failure to apply the proprietary finish to the first batch of stones be seen as a breach. According to the Court's interpretation of the T.L.C. Contract, neither Thompson or T.L.C. were obligated by contract to do so. The stones were to be finished under Thompson's supervision or by Thompson, and no evidence was presented that they were not. Thus, no breach of contract claim can be based on the failure to apply the proprietary finish.
 
 
 170
 Finally, the allegation that Reg withheld critical market information from Taurus could possibly be seen as a breach of his duty to assist with marketing the stones. Providing marketing assistance could be construed to mean full disclosure by Reg about the market for the Gemstones. At trial, however, both sides agreed that Reg ultimately disclosed the information to Taurus. His explanation for the delay in doing so was that he wanted to confirm the unsubstantiated rumor about the Burmese rubies, and not upset the market in the process. Given that Reg had more experience in the market than Taurus, it follows that he would be in a better position to be able to assess the validity of the information, and its effect on the market. Thus, the fact that he waited until the rumor was confirmed and he had determined its effect on the market does not constitute a breach based on lack of candor. Moreover, Taurus offered no evidence that this delay was intended by Reg as a repudiation of an obligation to assist with marketing. The Court finds that the delayed disclosure of information about market changes was not a failure to perform when due, or an anticipatory repudiation of the contract. No breach occurred thereby.
 
 
 171
 The remaining claims stand on different footing and fail for other reasons. Those claims include the fact that Reg: 1) refused to disclose his attorney's name and address; 2) failed to provide access to his safe deposit box; 3) refused to allow the inspection of the rough material; 4) refused to provide his financial information to Taurus for bonding purposes; 5) refused to cooperate to obtain key man life insurance; and 6) refused to assist with selling the stones. Although the Thompson Contract required him to disclose his attorney's name and address upon execution of the contract, no evidence was presented that any injury was caused to Taurus by the absence of this information. Thus Taurus cannot succeed in proving breach of contract on this basis.
 
 
 172
 With respect to the safe deposit box, the parties did not dispute that Reg refused to provide access, but Taurus failed to point to a contractual duty for him to do so. Both contracts call for him to make certain information available "in a written format acceptable to Taurus' attorney," and to keep that information in a safe deposit box. Neither contract, however, states that Taurus was entitled to access to that safe deposit box upon demand. Instead, the contracts provide that the information stored in the safe deposit box "shall immediately be given to Taurus by Thompson's wife or attorney in the event of the disability or death of Thompson." Plfs' Exh. 13, p 3.3; Plfs' Exh. 14, p 1.2. Reg did not die or become disabled (at least as that term is used in this contract). The fact that he refused to allow Taurus into his safe deposit box does not constitute a breach of either contract.
 
 
 173
 Reg's alleged refusal to allow the inspection of the rough material that was the subject of the Thompson Contract is disputed. Moreover, the contract provides that the "rubies shall be inspected, weighed and approved by Taurus in Thompson's presence." Plfs' Exh. 13, p 3.1. After that inspection the material was to be bagged, sealed, and identified with their mutual marks. The evidence is that Reg offered to allow such inspection when officers of Taurus were in St. Louis to make a cash downpayment for the first twenty pounds of material. Although Taurus claims generally that they were not allowed to inspect the materials, they do not specifically deny Reg's assertion that he offered them the opportunity while they were in St. Louis in late 1993. In addition, Taurus has failed to substantiate their accusation with admissible evidence. No citation to any evidence accompanied Taurus's proposed finding of fact on this issue. Instead, the evidence was that Payne and members of Taurus were in St. Louis in November of 1993. Payne, Tr. Test., Cross-exam.
 
 
 174
 According to Payne, who stated under oath that he was a senior executive of a number of different companies, including Wrangler Corporation, the trip to St. Louis was to perform their "due diligence" prior to entering the deal. Id. He said he assumed Taurus did their own due diligence. Id. This testimony partially corroborates Reg's testimony that he offered to let Taurus officers see the rough material at that time. In addition, Goldberg testified that in November of 1993, Reg showed them a number of stones in bags while they were in St. Louis, and those stones appeared to be of the same quality as the ones they saw in Chicago. Goldberg Tr. Test., Direct-exam. Goldberg did not deny that Reg offered to show the rough material to them at that time. The Court finds that Taurus has failed to prove that Reg refused to allow them to inspect the 320 pounds of stones as required by the Thompson Contract.
 
 
 175
 In connection with the requirement that Reg be bonded and that he cooperate with Taurus to obtain key man life insurance, there is no dispute that Reg did not fully cooperate. The fact that Reg told Taurus he would not provide his financial information for purposes of acquiring a bond, however, does not settle the issue. Taurus presented no evidence at trial that such refusal resulted in the failure to obtain a bond. Goldberg's conclusory assertion that Taurus took all steps necessary to get a bond, but that Reg's refusal to provide that information prevented them from succeeding is without any support in the record. Moreover, no evidence of any injury caused to Taurus as a result of Reg's conduct was presented. Taurus may not base a claim for damages under a breach of contract theory on this meager evidence.
 
 
 176
 A similar fate must befall the claim that Reg failed to cooperate in getting key man life insurance. Reg partially performed in that he completed an application and submitted to a physical exam. His efforts led to a quote of $90,000.00 a year for the policy. Taurus, who was obligated to pay the premium, did not have sufficient cash to pay a retainer to bind the policy until its final approval, so they provided the insurance agent with some of their Gemstones. By the time Reg withdrew his name from the application, Taurus appeared unprepared to pay the large premium for the policy. No evidence was offered to support their claim that they stood ready to conclude the transaction, which means that Taurus cannot prove that Reg's refusal to cooperate caused them injury. A breach of contract claim cannot succeed without proof of each element, including damages caused by the breach.
 
 
 177
 The alleged breach based on Reg's refusal to assist with marketing the stones is disproved by testimony from Taurus' own witnesses. According to Payne, selling and marketing are two different tasks. Payne Tr. Test., Cross-exam. Marketing involves more general activities, such as promotion, advertising, locating areas in which selling may occur, and finding potential customers. Id. Goldberg's testimony supports a finding that Reg engaged in many marketing efforts on behalf of Taurus.
 
 
 178
 Reg went to the Tucson gem show with 2,000 pounds of Taurus' finished stones to show them around, test the response, and find out what else was on the market. He then reported back to Taurus by letter, bought a small sample of stones from other sellers at the show, and sent them to Taurus to assist with their sales efforts. After the show, Reg sent Taurus several lists of potential customers for them to forward to a sales agent in California. He agreed to participate by telephone in any meetings the California sales agent set up. Reg also spent two or three days with Stancil, training him on the grading and selling of the stones. He likewise agreed to participate by telephone in any meetings Stancil set up with a potential buyer. When Stancil received his training he was given a listing of wholesale prices for rubies and other stones, with Reg's hand-written notes on it. Plfs' Exh. 12.
 
 
 179
 In addition, Reg traveled to New York several times for purposes of showing the stones to potential buyers, although it is unclear whether those were buyers for the Taurus stones or the Dainty Stones. By Payne's own description of marketing, it is obvious that the above activities qualify as marketing and assisting with marketing. The fact that those activities did not lead to a sale does not deprive them of their ability to satisfy Reg's obligation under the contract. Reg did not breach the contract by refusing to assist with marketing.
 
 
 180
 Two other allegations were raised by Taurus in support of the breach of contract claim. First, Taurus claims that Reg tried to ruin their relationship with LEOCO, and second, they accuse him of being generally uncooperative. The first allegation is directed at the non-circumvention provisions of both contracts entered in late 1993. The relevant provision from the Thompson Contract is the following:
 
 
 181
 Thompson shall not contact LEOCO or any of its agents, representatives or employees without the written permission of Taurus, and in no instance shall they contact any of the aforesaid for the purpose of marketing or finishing the rubies ... without Taurus' express written approval.
 
 
 182
 Plfs' Exh. 13, p 13. The T.L.C. Contract contained the same language with respect to Thompson and T.L.C. Plfs' Exh. 14, p 11.
 
 
 183
 The contacts Reg had with members of LEOCO include a few conversations with Payne and several with Stancil, which were at Taurus's instigation. The evidence is that Payne initiated any communication between him and Reg but that contact was not for the purpose of marketing and finishing the rubies by Thompson for LEOCO. That is the meaning of a non-circumvention and exclusivity agreement. Moreover, the contact Reg had with Stancil was encouraged by Taurus, which makes it difficult to classify it as violating the non-circumvention agreement. In either case, Taurus failed to show that any of these contacts caused Taurus any harm whatsoever. Taurus fails to prove the elements of breach with respect to these activities.[14]
 
 
 184
 The claim that Reg was generally uncooperative is too vague to satisfy the elements of a breach of contract claim. It is also not supported by the evidence, which has shown repeated instances in which Reg cooperated with Taurus despite their growing animosity. When the parties' relationship finally broke down completely, the cause of that breakdown cannot be fully placed on Reg's head. Both sides contributed to the uncooperativeness, the atmosphere of distrust, and the inability to work together any more. No breach of contract claim can be founded on this allegation.
 
 C. FRAUD AND CONSTRUCTIVE FRAUD
 
 185
 In Indiana, the elements a plaintiff must prove to succeed on a fraud claim are: 1) a material misrepresentation of past or existing fact, 2) which was untrue, 3) was made with knowledge of or in reckless ignorance of its falsity, 4) was made with the intent to deceive, 5) was rightfully relied upon by the complaining party, and 6) which proximately caused the injury or damage complained of. Lawyers Title Ins. Corp. v. Pokraka, 595 N.E.2d 244, 249, (Ind.1992). The element of reliance is composed of two parts, the fact of reliance and the right to rely. Dawson v. Hummer, 649 N.E.2d 653, 660 (Ind.Ct.App.1995).
 
 
 186
 Constructive fraud arises when a course of conduct is proven that, if sanctioned by the law, would secure an unconscionable advantage, regardless of whether there was an intent to defraud. Id. at 661. The elements include a duty between the parties based on a special relationship, representations or omissions that violate that duty, reliance by the complaining party, injury proximately caused by the reliance, and the gaining of an advantage by the offending party. Id.
 
 
 187
 As applied to the facts of this case, the Court finds that Taurus has failed to prove any actual or constructive fraud. Primarily Taurus bases its fraud claim on the alleged guarantees provided by Thompson to them, which they claim induced them into and kept them in the contract they entered with him. The Court has already found that Thompson made no such guarantees, and the fact that he estimated a return that did not materialize could only amount to fraud under certain circumstances. If Taurus can prove that Thompson knew, or should have known, at the time he rendered his opinions that the outcomes he predicted could not be achieved, then Taurus could meet the element of a "material misrepresentation." Evidence of that nature was not presented at trial.
 
 
 188
 In addition, even if the statements were misrepresentations, the Court notes an issue about whether it was reasonable for Taurus to rely on those statements alone before investing more than one-quarter of a million dollars in the deal. Also critical to resolution of this claim is a determination about the reasonableness of Taurus' assumption that there was no risk, or only a low risk, involved in the transaction merely because Thompson did not specifically state that the venture was risky. Taurus's own witness (Tom Payne) called it an "extraordinary deal." According to Payne, the deal offered them the opportunity to turn a small amount of money into millions of dollars. What rational person would not be alerted that a fair amount of risk was involved in order to generate that big of a return?
 
 
 189
 Based on the evidence of record, the Court finds that Taurus should have been alerted to the riskiness of the proposed venture when they heard Reg say he had a proprietary process that transformed otherwise "worthless" rubies into valuable ones. See Discussion, p. 55 (if the process was so valuable it should have been clearly written into the contract). Peg Goldberg testified that this is what he told them. A rational person would have been skeptical about this statement and perceived a degree of risk. Thus, even if Reg had made this claim, it would not have been reasonable to rely only on such a representation before investing a quarter of a million dollars in the venture.
 
 
 190
 Moreover, given that the statements upon which Taurus relied regarding the value of the stones were made by the person trying to sell the gems to them, perhaps a second opinion would have been appropriate. Taurus attempts to portray their relationship with Thompson as a special one, qualifying for the Court's protection, because of Thompson's self-proclaimed expertise in the gemstone industry.[15] No evidence was presented that Taurus, or any of its officers, suffered from a mental incapacity that would prevent them from checking out the references of a person who makes such claims. All of the evidence presented demonstrates that these two parties dealt with each other at arms-length, and that each of them knew what they were doing in connection with the transaction. As noted before, the primary purpose of their agreement was to move the Gemstones through the economy and make a profit doing so. Neither of the parties were deceived by any conduct, statements, or representations of the other.
 
 
 191
 Nor was there a confidential relationship between them that would give rise to a constructive fraud claim. See Comfax v. North American Van Lines, 587 N.E.2d 118, 125 (Ind.Ct.App.1992) (requisite confidential relationship for constructive fraud claim cannot be predicated on situation where parties engaged in an arms-length contractual arrangement). The question of whether such a relationship existed is for the finder of fact, in this case the Court. Here, the' Court finds that Taurus, who claimed in the recitals of both contracts to be "engaged in the business of selling scientific and rare earth metals and precious gemstones" cannot claim after the fact that they were so inexperienced in such matters that they were forced to rely only on Thompson's representations as to the value of the stones they were about to buy. The two statements are too inconsistent to be reconciled, and the Court is not inclined to give credence to the latter. For all these reasons, the Court finds that Taurus has failed to prove the elements of either a fraud or constructive fraud claim against Thompson.
 
 D. CONSTRUCTIVE TRUST
 
 192
 Under Indiana law, "a constructive trust will be imposed on property only where actual or constructive fraud is found, and a confidential or fiduciary relationship has been breached." Comfax, 587 N.E.2d at 126. As the Court has already stated, the parties here were engaged in an arms-length transaction with each other, in which both sides had equal ability to ascertain the truth of what was being said. No fiduciary or confidential relationship existed, and no actual or constructive fraud occurred. Both of these findings prevent the Court from imposing a constructive trust on the property in Thompson's possession.
 
 E. RICO
 
 193
 A civil RICO action may be based on one of a series of crimes, including the federal crimes of mail and wire fraud. Those are the crimes on which Taurus bases its allegation that Reg is guilty of a RICO violation. Based on the Court's rulings above, no further discussion is warranted to resolve this claim. In the absence of any finding of fraud, the RICO claim must fail.
 
 F. DEFENDANTS' COUNTERCLAIM
 
 194
 Thompson's counterclaim is for payment of his grading fees, in the amount of $7,427.42, in connection with grading 37,137.09 carats of finished stones at $.20 per carat. It is also for reimbursement of the expense of a powder scale, in the amount of $45.00, and for payment for three ruby cabochons that remain in Taurus' possession. Those rubies belong to Reg and were only loaned to Taurus to use in their sales efforts. According to Thompson they are worth $2,584.50. In addition, Reg seeks reimbursement for his travel expenses for the February and August, 1994, trips to New York, in the amount of $2,351.86. The total amount of the counterclaim is $12,408.78, plus interests and costs.
 
 
 195
 The Court has already found that Reg is responsible for his own expenses incurred during the course of his sales efforts under the Thompson Contract. From the evidence of record, it appears that the trip's purposes may have been to sell both the Dainty Stones and the Taurus stones. However, Reg has failed to prove that Taurus agreed to pay his travel expenses in relation to either one of these trips. The fact that Taurus paid for some of Reg's travel expenses, and that he demanded payment for these trips before he would depart, do not create a binding contract for such payment. For that reason, the Court declines to order such reimbursement.
 
 
 196
 With respect to the grading fees, however, the evidence shows that these fees were incurred, and that Taurus agreed under the T.L.C. Contract to pay them. Taurus is hereby ordered to pay Thompson the total amount of grading fees sought, in exchange for which Thompson must return the finished stones that belong to Taurus. The Court finds no evidence that the parties agreed as to who would pay for the powder scale, but if Taurus pays for the scale, in light of the parties' failed relationship, the Court orders Thompson to give it to them.
 
 
 197
 The three ruby cabochons that Taurus possesses and that belong to Reg must either be returned, or Taurus must pay Reg either the current fair market value of the stones, or the price he actually paid for them, whichever is less. For Reg to make a profit on these stones, which were not the subject of any sales contract, would constitute a windfall to him. The Court will not sanction such a result, and thus orders restitution in an amount that places the risk of the stones having declined in value on Reg.
 
 
 198
 Finally, Reg claimed damages pursuant to a "memorandum of understanding," equal to fifty percent of an earnest money deposit from a potential buyer who did not conclude the transaction. That memorandum did not support a finding that the earnest money was actually deposited, and Reg failed to offer any proof of his actual damages from Taurus' failure to pay him his share. That portion of his counterclaim is denied.
 
 IV. CONCLUSION
 
 199
 This matter came before the Court in a bench trial, and having received all of the evidence, heard the arguments of the parties, and considered their briefs, the Court finds that Taurus has failed to prevail on any of the claims it brought against Thompson or Reg. Taurus brought claims for breach of contract, fraud and constructive fraud, a civil RICO violation, and sought the imposition of a constructive trust based on unjust enrichment and on Reg's failure to obtain insurance and a bond. The last claim was considered as part of the breach of contract claim. For all of the reasons stated above, the Court finds that the claims against Reg and T.L.C. for breach of contract, fraud, constructive fraud and civil RICO violations have failed. Likewise, the claims seeking to impose a constructive trust must fail. Judgment should be entered accordingly against the plaintiffs on their complaint.
 
 
 200
 The Thompson defendants filed a counterclaim for damages based on Taurus' agreement to pay for the grading of more than 37,000 carats of ruby cabochons by Thompson, and seeking reimbursement for the purchase of a powder scale, and of certain travel expenses. Reginald Thompson also claims that Taurus owes him for several ruby cabochons he delivered to them, and for which he has not been paid, and for his share of an earnest money deposit.
 
 
 201
 Of the claims presented by Thompson, the Court found in favor of the defendant with regard to the grading fees, in the amount of $7,427.42, and the rubies that belong to Reg, but are retained by Taurus. Taurus is hereby ordered to pay Thompson an amount equal to the claimed grading fees, plus an amount equal to the lower of Reg's actual cost of acquiring the rubies in dispute, or the current market value. In lieu of paying Reg for the three ruby cabochons that belong to him, Taurus may return them. Upon receipt of Taurus' payment for the grading fees, Thompson must return all of Taurus' finished stones to them.
 
 
 202
 In light of the Court's interpretation of the parties' agreements, it will not order the payment by Taurus of Reg's claimed travel expenses, nor the alleged share of an earnest money deposit. Moreover, Taurus may, at its option, pay Thompson for the powder scale, but if such payment is made the scale will belong to Taurus. The parties are to bear their own costs of this action.
 
 
 203
 IT IS SO ORDERED this 12th day February, 1997.
 
 
 
 [1]
 Plaintiffs seem to have overlooked the fact that this Court dismissed all counts of the complaint against defendant Julia Thompson in its July 31, 1996, order. Thompson Lapidary Company, Inc. and AL sub2 O sub3 Corporation were dismissed by order entered April 12, 1996, leaving only Reginald Thompson and TLC Gem Labs, Inc. as defendants in this action. In their briefs, plaintiffs continued to refer to actions taken in collusion with Julia Thompson, or in connection with Thompson Lapidary Company, Inc. They also proposed the Court make specific findings about these dismissed parties
 
 
 [2]
 Both parties are referred to this Court's order dated July 31, 1996, in which post-trial briefing was ordered. Specifically the Court instructed the parties to "thoroughly discuss the relevant law for each type of claim, and its applicability to the evidence presented at the trial." Post-Trial Order at 2. Proposed findings of fact and conclusions of law were also required from both sides. With respect to the briefs, the Court is disappointed at the lack of thoroughness shown by the plaintiffs, particularly in relation to applying the relevant law to the evidence presented at the trial
 Moreover, both parties were lax in their rendering of proposed findings. The Court specifically directed that the "findings should include citations to the specific evidence, whether testimony or documentary, alleged to support each finding, and the conclusions of law should clearly cite the authority being applied for each conclusion." Id. With the exception of a few sparse and scattered examples, the proposed findings from either side were woefully lacking any citation to the relevant evidence. Likewise, the conclusions, or conclusory statements, were offered with almost no correlation to the law.
 These feeble examples of post-trial filings provided little assistance to the Court in sifting through all of the evidence, weighing it, and applying the law to the facts that have been found. In the future, counsel for both parties are cautioned to be more mindful of the specific instructions from the Court in any ordered briefing.
 
 
 [3]
 In fact, the Court notes that Thompson made an unannounced visit to Wansa in July or August of 1993, and discovered that the sample was not as representative as he had been told by Wansa. At that point Thompson withdrew his appraisal of those stones. See Def's Exh. AR, Letter Dated August 4, 1993. According to the testimony at the trial, shortly thereafter Thompson called to inform Goldberg that he had withdrawn the appraisal on Wansa's stones, and she asked him not to discuss it at that time
 
 
 [4]
 Stancil also tried to form his own group of investors to buy the Dainty Stones at the same time he was trying to sell them to LEOCO and others
 
 
 [5]
 Thompson admitted at trial that he should not have signed an assurance about materials in the bag when he had only felt them through the bag without seeing the stones. He stated that is not what a gemologist normally does, but he took the word of several people whom he trusted. Also, he had been instructed not to open the bag by someone from Taurus
 
 
 [6]
 Apparently Dainty's buyers did not have to submit a $50,000.00 nonrefundable deposit in order to get the chance to view the stones
 
 
 [7]
 The $20,000.00 that was eventually transferred to Thompson, however, was recorded as payment in full of a December 10, 1993, invoice from him for the 21.36 pounds of his own stones that were delivered to the cutter along with Taurus's stones in December, 1993. Plfs' Exh. 3; Def's Exh. K. Apparently, Taurus had agreed to buy that batch as well
 It is unclear whether Dainty's other buyer was the same one whose lawyers had contacted Thompson about a possible closing on February 1, 1994.
 
 
 [8]
 At trial, Thompson testified that Boot sent him close to 2,000 carats of finished stones to take with him to the Tucson show, as a special favor
 
 
 [9]
 Thompson had several heart attacks in 1977, and continued to suffer from a heart condition, which was why he was receiving Social Security disability payments
 
 
 [10]
 Trial testimony also indicated the parties made a trip to New York in February
 
 
 [11]
 A soft probe is when someone contacts a person's bank to verify that sufficient funds are available for a particular transaction. Although the bank will not reveal account numbers, or exact balances, it will state yes or no to such an inquiry. Thompson Tr. Test. Cross-exam
 
 
 [12]
 Upon review of both contracts the Court cannot discern any requirement that Thompson make himself available on demand to Taurus. See Exh. 13, p 11; Exh. 14, p 9
 
 
 [13]
 That information included the names, addresses, telephone numbers and contact persons at each cutting house used in connection with the transaction, as well as letters of introduction for Taurus. Also included was to be a written, detailed description of the proprietary process, and the names, addresses and phone numbers of Thompson's wife and attorney. Plfs' Exh. 13, p 3.3
 
 
 [14]
 In July and August, 1994, Thompson was contacted by Azlein, another client of Taurus' with whom he was forbidden to speak. That conduct also fails to demonstrate an intent to repudiate the noncircumvention agreement, or a failure to perform. Most of the contact occurred after the contract expired, which means it cannot be seen as a breach. In addition, no harm was shown to have been caused to Taurus as a result of this contact
 
 
 [15]
 As has happened often during the presentation of Taurus' arguments, the plaintiff fails to separate Reg from his company, T.L.C